## RIVER BEND ASSOCIATES, INC., ET AL. *v.* ZONING COMMISSION OF THE TOWN OF SIMSBURY ET AL.
### (SC 17026)

Sullivan, C. J., and Katz, Palmer, Vertefeuille and Zarella, Js.

Argued March 10—officially released September 7, 2004

*Brian R. Smith*, with whom were *Karen A. L. Perry*, *Matthew G. St. Amand* and, on the brief, *Robert S. Melvin*, *Robert J. Sitkowski* and *Nathan C. Lampard*, for the appellant (named defendant).

*Timothy S. Hollister*, with whom were *Amy E. Souchuns* and *Matthew Ranelli*, for the appellees (plaintiffs).

*Opinion*

SULLIVAN, C. J. The named defendant, the zoning commission of the town of Simsbury (zoning commission), appeals from the judgment of the trial court in favor of the plaintiffs, River Bend Associates, Inc., Griffin Land and Nurseries, Inc. (Griffin), and Fairfield 2000 Homes Corporation. The issue on appeal is whether the trial court properly sustained the plaintiffs' appeal from the zoning commission's denial of the plaintiffs' application for approval of certain amendments to the zoning regulations and zoning map of the town of Simsbury (town) and a master site plan, all relating to the construction of an affordable housing development within the meaning of General Statutes (Rev. to 1999) § 8-30g, as amended by Public Acts 1999, No. 99-261, and by the portions of Public Acts 2000, No. 00-206 (P.A. 00-206), that have been determined to be retroactive.[1] We conclude that the trial court properly sustained

---

[1] General Statutes (Rev. to 1999) § 8-30g, as amended by Public Acts 1999, No. 99-261, provides in relevant part: "(a) As used in this section: (1) 'Affordable housing development' means a proposed housing development (A) which is assisted housing or (B) in which not less than twenty-five per cent of the dwelling units will be conveyed by deeds containing covenants or restrictions which shall require that, for at least thirty years after the

the plaintiffs' appeal with respect to the amendments to the zoning regulations and zoning map and that it

initial occupation of the proposed development, (i) such dwelling units shall be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a. Of the dwelling units conveyed by deeds containing covenants or restrictions, a number of dwelling units equal to not less than ten per cent of all dwelling units in the development shall be sold or rented to persons and families whose income is less than or equal to sixty per cent of the area median income or sixty per cent of the state median income, whichever is less, and the remainder of the dwelling units conveyed by deeds containing covenants or restrictions shall be sold or rented to persons and families whose income is less than or equal to eighty per cent of the area median income or eighty per cent of the state median income, whichever is less; (2) 'affordable housing application' means any application made to a commission in connection with an affordable housing development by a person who proposes to develop such affordable housing; (3) 'assisted housing' means housing which is receiving, or will receive, financial assistance under any governmental program for the construction or substantial rehabilitation of low and moderate income housing, and any housing occupied by persons receiving rental assistance under chapter 319uu or Section 1437f of Title 42 of the United States Code; (4) 'commission' means a zoning commission, planning commission, planning and zoning commission, zoning board of appeals or municipal agency exercising zoning or planning authority; and (5) 'municipality' means any town, city or borough, whether consolidated or unconsolidated.

"(b) Any person whose affordable housing application is denied or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, specified in subparagraph (B) of subdivision (1) of subsection (a) of this section, contained in the affordable housing development, may appeal such decision pursuant to the procedures of this section. Such appeal shall be filed within the time period for filing appeals as set forth in sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable, and shall be made returnable to the superior court for the judicial district where the real property which is the subject of the application is located. Affordable housing appeals, including pretrial motions, shall be heard by a judge assigned by the Chief Court Administrator to hear such appeals. To the extent practicable, efforts shall be made to assign such cases to a small number of judges, sitting in geographically diverse parts of the state, so that a consistent body of expertise can be developed. Unless otherwise ordered by the Chief Court Administrator, such appeals, including pretrial motions, shall be heard by such assigned judges in the judicial district in which such judge is sitting. Appeals taken pursuant to this subsection shall be privileged cases to be heard by the court as soon after the return day as is practicable. Except as otherwise provided in this section, appeals involving an affordable housing application shall proceed in conformance with the provisions of said sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable. . . .

"(d) Following a decision by a commission to reject an affordable housing application or to approve an application with restrictions which have a

improperly sustained the appeal with respect to the denial of the site plan. Accordingly, we reverse the judgment of the trial court in part.

substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, the applicant may, within the period for filing an appeal of such decision, submit to the commission a proposed modification of its proposal responding to some or all of the objections or restrictions articulated by the commission, which shall be treated as an amendment to the original proposal. The filing of such a proposed modification shall stay the period for filing an appeal from the decision of the commission on the original application. The commission may hold a public hearing and shall render a decision on the proposed modification within forty-five days of the receipt of such proposed modification. The commission shall issue notice of its decision as provided by law. Failure of the commission to render a decision within said forty-five days shall constitute a rejection of the proposed modification. Within the time period for filing an appeal on the proposed modification as set forth in sections 8-8, 8-9, 8-28, 8-30, or 8-30a, as applicable, the applicant may appeal the commission's decision on the original application and the proposed modification in the manner set forth in this section. Nothing in this subsection shall be construed to limit the right of an applicant to appeal the original decision of the commission in the manner set forth in this section without submitting a proposed modification or to limit the issues which may be raised in any appeal under this section. . . .

"(f) Notwithstanding the provisions of subsections (a) to (e), inclusive, of this section, the affordable housing appeals procedure established under this section shall not be available if the real property which is the subject of the application is located in a municipality in which at least ten per cent of all dwelling units in the municipality are (1) assisted housing or (2) currently financed by Connecticut Housing Finance Authority mortgages or (3) subject to deeds containing covenants or restrictions which require that such dwelling units be sold or rented at, or below, prices which will preserve the units as affordable housing, as defined in section 8-39a, for persons and families whose income is less than or equal to eighty per cent of the area median income. The Commissioner of Economic and Community Development shall, pursuant to regulations adopted under the provisions of chapter 54, promulgate a list of municipalities which satisfy the criteria contained in this subsection and shall update such list not less than annually."

Public Acts 2000, No. 00-206, § 1 (g), which amended § 8-30g (c) and is now codified at § 8-30g (g), provides: "Upon an appeal taken under subsection (f) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record. The commission shall also have the burden to prove, based upon the evidence in the record compiled before such commission, that (1) (A) the decision is necessary to protect substantial public interests in health, safety, or other matters which

The record reveals the following relevant facts and procedural history. River Bend Associates, Inc., a wholly owned subsidiary of Griffin, is the owner of a 363 acre property in Simsbury (property). The property, portions of which were used for many years to grow tobacco, is bounded by Hoskins Road on the south, County Road on the northeast and Holcomb Road on the northwest, with Firetown Road and Barndoor Hills Road running through its southwest corner. On November 10, 1999, the plaintiffs submitted to the zoning commission an application for an amendment to the town zoning regulations to create a new housing opportunity development district (text amendment) and an amendment to the town zoning map rezoning the property to the new district (map amendment).[2] The plaintiffs also

the commission may legally consider; (B) such public interests clearly outweigh the need for affordable housing; and (C) such public interests cannot be protected by reasonable changes to the affordable housing development, or (2) (A) the application which was the subject of the decision from which such appeal was taken would locate affordable housing in an area which is zoned for industrial use and which does not permit residential uses, and (B) the development is not assisted housing, as defined in subsection (a) of this section. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it." This portion of P.A. 00-206 was determined to be retroactive in *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, 256 Conn. 674, 701, 780 A.2d 1 (2001).

For convenience, all references in this opinion to subsections (a), (b), (d) and (f) of § 8-30g are to the 1999 revision of the statutes as amended by Public Acts 1999, No. 99-261. All references to § 8-30g (g) are to the current version of the statute.

[2] When the plaintiffs submitted their application, there was no requirement that the plaintiffs obtain a zone change in order to obtain approval of their site plan. See *Wisniowski* v. *Planning Commission*, 37 Conn. App. 303, 317, 655 A.2d 1146 (1995) (site plan for affordable housing development may not be denied because it does not comply with existing zoning regulations), cert. denied, 233 Conn. 909, 658 A.2d 981 (1995). In 2000, however, the legislature amended the statute to require an affordable zoning applicant to submit draft zoning regulations in support of its application. See P.A. 00-206, § 1 (b) (1) (E), now codified at § 8-30g (b) (1) (E). The zoning commission makes no claim that the provision is retroactive. Although the plaintiffs were not *required* to do so, the zoning commission makes no claim that

requested approval of a master site plan for the property, known as Meadowood, in which they proposed to construct 640 residential units comprised of a mix of single-family residences on subdivided lots of 40,000 to 60,000 square feet, smaller single-family residences in clusters, smaller residences intended for homeowners without children, and attached two-family and three-family residences. The plaintiffs submitted with their application an affordability plan indicating that the development plan met the criteria for an affordable housing development set forth in § 8-30g (a) (1) because 15 percent of the units would be affordable for thirty years to families earning 80 percent or less of the area median income for greater Hartford and 10 percent of the units would be affordable to families earning 60 percent or less of the area or statewide median income. The plaintiffs also submitted an affordable housing analysis prepared by John Scott of Scott, Kenney Partners. The analysis indicated that because, in 1998, only 3.03 percent of the town's housing units qualified as affordable, the zoning commission's decision would not be exempt from the appeal procedures provided by § 8-30g. See General Statutes (Rev. to 1999) § 8-30g (f) (statute's appeal procedures not available if property is located in municipality in which 10 percent of properties meet specified criteria). Simultaneously with their application to the zoning commission, the plaintiffs submitted an application to the town's planning commission for approval of a master subdivision plan, an application to the town's conservation and inland wetlands commission (conservation commission) for a regulated activities permit and an application to the town's water pollution control authority for the transfer of a sewage disposal allocation from an adjacent industrial

the plaintiffs were not *entitled* to seek a zone change and to have the application considered by the zoning commission under the standards set forth in § 8-30g (g).

zoned property owned by Griffin to the proposed development. Ultimately, all of the applications were denied.

In May, 2000, the plaintiffs submitted a revised application to the zoning commission pursuant to § 8-30g (d). The revised application reduced the total number of residences to 371, including 102 residences on subdivided lots, 79 residences designed for homeowners without children and 190 smaller single-family residences in clusters, 93 of which would be sold at affordable prices as provided by § 8-30g. All residences, except those on the subdivided lots, would be part of a common interest ownership community pursuant to General Statutes § 47-200 et seq. The plaintiffs again submitted an affordability plan indicating that the development met the criteria for an affordable housing development. The plaintiffs also submitted revised applications to the planning commission and to the conservation commission. In addition, they applied to the water pollution control authority for sewer connections for the 269 common interest ownership residences and to the Farmington Valley health district (health district) for approval of septic systems for the 102 homes on subdivided lots. The defendant North Simsbury Coalition, Inc. (coalition), intervened in the application proceedings pursuant to General Statutes § 22a-19,[3] which authorizes intervention into any proceeding by any person or organization upon the allegation that the proceeding involves conduct reasonably likely to cause unreasonable pollution.

[3] General Statutes § 22a-19 (a) provides: "In any administrative, licensing or other proceeding, and in any judicial review thereof made available by law, the Attorney General, any political subdivision of the state, any instrumentality or agency of the state or of a political subdivision thereof, any person, partnership, corporation, association, organization or other legal entity may intervene as a party on the filing of a verified pleading asserting that the proceeding or action for judicial review involves conduct which has, or which is reasonably likely to have, the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state."

On June 13, 2000, David Knauf, the assistant director of health for the health district, wrote to William Voelker, the director of community planning and development for the town, indicating that soil conditions at the site were suitable for the installation of septic systems, with the exception of two lots. He also indicated that the health district had concerns about the soil mixing plan and protection of the aquifer. On June 28, 2000, the water pollution control authority voted to deny the sewer connections on the ground that fifty-five of the residences with septic systems were located within the sewer service area and, if any of the septic systems failed, connection to the sewer system would be required.[4] The water pollution control authority also stated, however, that "[t]he 110,000 gallon allocation is, and will remain, available and the [authority] is inclined to approve any application that utilizes up to this allocation."

On June 29, 2000, the zoning commission, together with the planning commission, held a joint public hearing on the revised development proposal. A major topic of concern at the hearing was, as it had been throughout the application proceedings, the existence of residual pesticides in the soil on the portions of the property that had been used to grow tobacco. The plaintiffs had retained Fuss and O'Neill, Inc. (Fuss and O'Neill), to perform an environmental site investigation prior to submitting the original applications. Fuss and O'Neill determined that chlordane was present in the soil at certain locations on the property in concentrations exceeding those set forth in the remediation standard regulations published by the department of environ-

---

[4] The water pollution control authority's denial of the plaintiffs' application for sewer connections was the subject of a separate declaratory judgment action by the plaintiffs. This court ultimately affirmed the dismissal of that action because the plaintiffs had failed to exhaust their administrative remedies. See *River Bend Associates, Inc.* v. *Water Pollution Control Authority*, 262 Conn. 84, 809 A.2d 492 (2002).

mental protection (department) for direct exposure to soil in a residential setting. See Regs., Conn. State Agencies § 22a-133k-1 et seq. The summary of environmental conditions and recommended remedial actions submitted by the plaintiffs in connection with their November, 1999 applications, which was part of the record before the zoning commission in the revised application proceedings, stated that the department's regulations "establish criteria for the remediation of soil and groundwater at specific types of sites where releases of hazardous materials or petroleum products have occurred. Because the Meadowood site is not an 'establishment' and because the Meadowood remediation is not being conducted under the voluntary corrective action program described in [General Statutes § 22a-133x], the [remediation standard regulations] do not apply to remediation at Meadowood. Nevertheless, the [department] considers the [remediation standard regulations] to be the only appropriate standards to use when evaluating a site like the proposed Meadowood development."

The plaintiffs had submitted, as part of their revised applications, a revised soil mixing plan in which they proposed to remedy the contamination by plowing the pesticides, which were located in the top several inches of the soil, into the ground at depths ranging from thirty-six to forty-eight inches. The plan also involved the excavation and disposal off-site of contaminated soils in areas where the water table was located at a depth of less than four feet below grade. At the June 29, 2000 joint hearing, Robert Potterton of Fuss and O'Neill testified on behalf of the plaintiffs that the property would meet the remediation standard regulations as a result of the revised soil mixing plan and that implementation of the plan would not result in groundwater contamination.

The town retained Environmental Risk Limited (Environmental Risk) to evaluate the plaintiffs' remediation

plan. Gordon Brookman, the president of Environmental Risk, testified at the June 29, 2000 hearing that the soil mixing plan was inadequate to protect the public health, safety and general welfare. Specifically, he raised the following concerns: (1) the cost estimate for the remediation assumed that compliance would be achieved on the first attempt and that the importation of additional topsoil from off-site would not be required to support grass and shrubs; (2) the plan to move contaminated soils away from the perimeter of the property into the interior treated the property as one large parcel instead of multiple small parcels, as contemplated by the regulations, and did not adequately protect the groundwater; (3) the ecological risk assessment pertaining to surface water contamination at the site was inconclusive; (4) the preremediation soil methodology was unclear; (5) the groundwater sampling methodology was unclear; (6) the plan proposed excavation of "hot spots" only if the contamination was six times the exposure standard, instead of two times the standard, as Environmental Risk proposed; (7) the postremediation sampling plan was unclear and possibly inadequate; and (8) the air and dust monitoring plan was unclear and the plan did not indicate whether air and dust monitoring would be performed during pilot testing. Environmental Risk also presented to the zoning commission a letter outlining these concerns.

In a letter dated July 5, 2000, Potterton responded to Brookman's concerns. Potterton wrote that: (1) the cost of importing new topsoil to the site would be covered by the 15 percent contingency included in the cost estimate and the soil mixing plan was the least expensive remediation alternative; (2) with respect to moving the contaminated soils to the interior of the property, the department had indicated to the plaintiffs that it was primarily concerned with the liability of prospective property owners in that area and that "institutional

controls" would be an acceptable method of dealing with that concern; in addition, sampling data indicated the contamination of the aquifer was not an issue; (3) Jerry Cura, an expert in the effect of pollutants on local ecology, had testified that there would be no adverse effect from residual pesticides on the local wetlands ecosystem; (4) the preremediation soil sampling methodology was clear; (5) there would be little point in engaging in extensive preremediation groundwater sampling because the plaintiffs planned to remove contaminated soils in order to comply with the remediation standard regulations; (6) under the department's regulations, concentrations exceeding two times the remediation standard merely trigger a need for remediation, i.e., soil mixing, not excavation of the soils and removal of them from the site; (7) the plaintiffs were willing to work closely with the town to develop a postremediation sampling plan acceptable to all parties; and (8) air monitoring would be conducted during the pilot study.

On July 17, 2000, the zoning commission passed a motion denying the plaintiffs' revised submission. With respect to the proposed text amendment, the zoning commission found that: (1) the proposed regulations did not provide for appropriately designed subdivisions and did not meet the criteria for a traditional neighborhood development; (2) the site specific zone proposed by the plaintiffs did not afford adequate assurances that environmental safeguards would be provided to address environmental concerns or that soil mixing would be a safe and effective remediation method; (3) the affordability plan still contained deficiencies; and (4) the proposed regulations had a number of deficiencies.[5] The zoning commission also adopted the planning commis-

---

[5] Specifically, the zoning commission found that the term "housing opportunity unit" was defined, but not used, in the regulations. In addition, the regulations did not provide standards for "flag lots" and did not provide a buffer for multi-family attached dwellings.

sion's referral recommending denial of the text amendment, the map amendment and site plan approval.[6]

With respect to the map amendment, the zoning commission concluded that, because the text amendment had been denied, it could not rezone the property to a nonexistent zone. It also concluded that, because the water pollution control authority had indicated that it would not approve a plan with a higher density than allowed by current regulations, a map change was not necessary. In addition, the zoning commission was concerned about the segregation of the affordable housing units from other units in the development and about increased traffic.

With respect to the site plan, the zoning commission stated that "the [plaintiffs] have expressly tied the modified site plan application to the modified . . . zone amendment and modified zone change petitions. Since this [c]ommission is denying these two petitions, the site plan is also denied." It also stated that the site plan had the same deficiencies as the requests for amendment. Finally, it indicated that the soil mixing plan placed the public health and safety at risk and reason-

[6] The planning commission had concluded that the proposed development violated several policies contained in the town's plan of development in that it did not preserve natural features and topography, properly use cluster zoning, preserve scenic vistas or maintain a proper scale. It also concluded that, although the proposal was consistent with the town's policy of providing affordable housing, a special zone was not required to construct affordable housing at the proposed site. In addition, it concluded that the site specific zone could create "artificial impediments to better developments and more affordable housing" throughout the town. With respect to the remediation plan, the planning commission voiced many of the same concerns that Brookman had expressed and concluded that "[t]he potential health and safety issues outweigh the need for affordable housing in this instance." Specifically, it concluded that "[t]here is a cancer danger that we cannot assess based on this record." In addition, the planning commission concluded that much of the plaintiffs' "infrastructure analysis" was cursory and inadequate, especially in light of the water pollution control authority's denial of the sewer approval.

able changes to the plan could not be made because the water pollution control authority had denied the plaintiffs' application.

Addressing the coalition's intervention petition, the zoning commission incorporated all of its findings with respect to its denial of the zoning amendments and site plan into its findings on the petition. It concluded that the development had, or was reasonably likely to have, "the effect of unreasonably polluting, impairing or destroying the public trust in the air, water or other natural resources of the state" and there were feasible and reasonable alternatives to the development of the property.

On July 19, 2000, the conservation commission denied the plaintiffs' application for a revised regulated activities permit.[7] On July 25, 2000, the planning commission passed a motion denying the plaintiffs' revised subdivision submission.[8]

The plaintiffs appealed to the Superior Court from the zoning commission's denial of their application pursuant to § 8-30g (g). The trial court sustained the appeal, concluding that "the overarching flaw in [the zoning commission's] treatment of these matters is its failure

[7] The denial of this permit was the subject of the plaintiffs' appeal in *River Bend Associates, Inc.* v. *Conservation & Inland Wetlands Commission*, 269 Conn. 57, 848 A.2d 395 (2004). In that case, we reversed the judgment of the trial court dismissing the plaintiffs' appeal from the ruling of the conservation and inland wetlands commission and remanded the case to the trial court for further review of the commission's ruling focused solely on the impact of the proposed activities on the wetlands, watercourses and upland review areas. Id., 60–61, 61 n.4.

[8] The planning commission's denial of the subdivision application is the subject of the plaintiffs' appeal in the companion case of *River Bend Associates, Inc.* v. *Planning Commission*, 271 Conn. 41, 856 A.2d 959 (2004), which we released on the same date as this opinion. As we discuss more fully later in this opinion, we concluded in that case that the trial court improperly had sustained the plaintiffs' appeal and that the planning commission properly had denied the subdivision application in light of the water pollution control authority's denial of their application for sewer connections. Id., 58.

genuinely to weigh [the town's] need for affordable housing against the various defects it found in the zone change request and the site plan and to prove that the latter 'clearly outweigh' the former." The court then noted that some reasons cited by the zoning commission in its denial of the plaintiffs' application related to all three proposals and some related only to individual proposals. The court first addressed each individual proposal and the specific reasons that each was denied and then addressed the reasons that related to all of the proposals. The trial court found with respect to the denial of the proposed text amendment that the zoning commission's stated reasons, i.e., concerns about the character and design of the proposed neighborhoods, deficiencies in the proposed regulations and deficiencies in the affordability plan, did not justify the denial of the application. With respect to the denial of the proposed map amendment, the trial court again found that the zoning commission's stated reasons, i.e., the denial of the zoning regulation amendment,[9] the denial of the sewer application and wetlands permit, traffic concerns and deficiencies in the site plan, did not justify the denial of the amendment. The court specifically rejected the zoning commission's argument that it could not approve the application in light of the water pollution control authority's denial of the sewer application because the plaintiffs were appealing from that denial and, therefore, it was not final. To allow the zoning commission to rely on a denial that ultimately could be set aside, the court reasoned, would be to allow it to abdicate its responsibilities under the affordable housing statute to the water pollution control authority.

---

[9] The plaintiffs concede on appeal that the trial court improperly found that the denial of the text amendment, even if valid, would not be a valid reason for denying the map amendment. They argue that the impropriety was harmless, however, because the trial court properly found that the denial of the text amendment was invalid. For the reasons discussed more fully in part II B 1 of this opinion, we agree.

Moreover, for the zoning commission to rely on the denial without considering whether reasonable changes to the sewer application could be made exposed the commission "to a charge of pretextual conduct." With respect to the zoning commission's denial of the site plan application, the court concluded that the denials of the text amendment and map amendment were not sufficient reasons to reject the site plan because affordable housing developments are not required to conform to existing zoning.

The court then identified soil contamination as an issue that was related to both the proposed zone change and the proposed site plan. With respect to the zoning commission's conclusion that the remediation plan was inadequate, the court concluded that "nothing in the record . . . supports anything but a mere possibility that the requested subdivision approval would harm the environment. There is no evidence quantifying the potential level of harm to the public health or safety or estimating the probability that the harm would occur if the subdivision was approved." Accordingly, the court concluded that the zoning commission had not met its burden of proving that the denial "was necessary to protect substantial public interests in the maintenance of an uncontaminated environment."

With respect to the zoning commission's finding on the coalition's intervention pursuant to § 22a-19, the court found that there was no evidence to support the determination that " 'unreasonable pollution was reasonably likely' " if the site plan were to be approved. The court also concluded that § 22a-19 did not exempt the zoning commission from its burden of proving that the development would harm a substantial public interest under § 8-30g.

The trial court sustained the plaintiffs' appeal from the denial of all three proposals and ordered the zoning commission to approve the application with the follow-

ing conditions: (1) if the plaintiffs' appeal from the water pollution control authority's denial of the sewer application was denied, the plaintiffs would be required to modify the site plan to conform to the decision; (2) if the plaintiffs' appeal from the conservation commission's denial of the regulated activity permit was denied and the decision affected the site plan, the plaintiffs would be required to modify the plan to conform to that decision; (3) postremediation soil sampling and groundwater monitoring would have to establish that remediation standard regulations had been met; and (4) the property would have to be in compliance with all applicable remediation standard regulations before construction could begin. The zoning commission, on the granting of certification, appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1. Additional facts and procedural history will be provided as necessary.

The zoning commission claims on appeal that the trial court improperly determined that: (1) the zoning commission did not acknowledge the town's need for affordable housing, did not have sufficient evidence to support the reasons for its denial, and did not properly balance that need against substantial public interests in health and safety; (2) the water pollution control authority's decision was not final in the context of a zone change application; (3) the zoning commission used the denial of the public sewer connection as a pretext to deny the zone change applications; (4) the zoning commission's denial based on deficiencies in the affordability plan did not implicate a substantial public interest that it legally may consider; and (5) the soil contamination issue was not relevant to the zoning map amendment request.[10] The zoning commission also

[10] The zoning commission challenges only the trial court's conclusions with respect to the soil contamination issue and the deficiencies in the affordability plan. It does not challenge the court's conclusions with respect

claims that the cumulative weight of the reasons for denying the zoning amendments justified their denial even if each individual reason did not and that the conditions imposed by the trial court on construction of the development were unreasonable.

We approach the zoning commission's claims in a different order and from a slightly different perspective than the zoning commission does. In light of our decision in the companion case of *River Bend Associates, Inc.* v. *Planning Commission*, 271 Conn. 41, 856 A.2d 959 (2004), we conclude that the planning commission's denial of the subdivision application rendered moot the plaintiffs' claim in the present case that the zoning commission improperly denied the site plan application. We also conclude that the trial court properly determined that the soil contamination issue and deficiencies in the affordable housing plan did not constitute valid reasons for denying the zoning amendments. We further conclude that, to the extent that the trial court suggested that the zoning commission was required to acknowledge expressly on the record the town's need for affordable housing, any such suggestion was improper but harmless. In addition, we conclude that the cumulative weight of the reasons for denial did not constitute a substantial public interest outweighing the town's need for affordable housing. Finally, we conclude that the conditions imposed by the trial court either related solely to the site plan, and are therefore moot, or were reasonable.

I

We first address the effect of our decision in the companion case of *River Bend Associates, Inc.* v. *Planning Commission*, supra, 271 Conn. 41, on our resolution of the claims in this case. In the companion case, we concluded that the trial court improperly sustained the plaintiffs' appeal from the planning commission's

to the other reasons given by the zoning commission for denial of the zoning amendments.

denial of their subdivision application and that the planning commission properly had denied the application because the water pollution control authority had denied the plaintiffs' application for sewer connections. Id., 57. We reasoned that the planning commission could not conditionally approve the subdivision application because it was not reasonably probable that the sewer application would be approved and the subdivision plan could not be implemented without the sewer connections. See id., citing *Carpenter* v. *Planning & Zoning Commission*, 176 Conn. 581, 409 A.2d 1029 (1979).

In the present case, the plaintiffs' site plan application was based on the subdivision application that was denied by the planning commission. In light of our decision in the companion case, we conclude that the plaintiffs' claim that the various reasons proffered by the zoning commission for denying the site plan application were invalid was rendered moot by the planning commission's decision. Once the planning commission denied the subdivision application, the zoning commission could not be ordered to approve the site plan application because there was no reasonable probability that the subdivision plan on which the site plan was premised would be approved. See *Wyatt Energy, Inc.* v. *Motiva Enterprises, LLC*, 81 Conn. App. 659, 661, 841 A.2d 246 (2004) ("A case becomes moot when due to intervening circumstances a controversy between the parties no longer exists. . . . An issue is moot when the court can no longer grant any practical relief." [Internal quotation marks omitted.]). Put another way, if the planning commission had denied the subdivision application *before* the zoning commission rendered its decision on the site plan, the denial would have constituted a valid reason for denying the site plan application.

We also conclude that the planning commission's denial of the subdivision application did not render the

plaintiffs' claims pertaining to the zoning amendments moot because the viability of those amendments was not predicated on the viability of the subdivision plan.[11] Therefore, the denial of the subdivision application plan does not preclude this court from granting the relief sought by the plaintiffs, namely, an order to the zoning commission to approve the zoning amendments. Accordingly, the only issues remaining in this appeal are whether the trial court properly sustained the plaintiffs' appeal from the zoning commission's denial of the plaintiffs' requests for amendment of the zoning regulations and the zone map.

## II

The zoning commission claims that the soil contamination issue and deficiencies in the affordability plan

[11] The zoning commission stated as a reason for denying the zoning amendments that "[a] map change to the [housing opportunity development] zone is not necessary to develop a subdivision with septic system installations at the existing zone's densities. The proposed density allowed by the . . . zone is not supported by sufficient evidence since the [a]pplicants specifically requested the [water pollution control authority] for approval of such a plan with higher density than allowed by current zoning and that plan was denied." Thus, the zoning commission suggested that the map change was not warranted because the water pollution control authority had indicated that it would not approve sewer connections if the density was higher than allowed under existing regulations. We disagree. First, the zoning commission does not cite, and we are not aware of, any authority for the proposition that an affordable housing zone must be "necessary" to be approved. Second, even if we assume that a zone change must be necessary to be approved, the record does not establish that any subdivision plan approved by the water pollution control authority necessarily would comply with existing regulations. The water pollution control authority had indicated that its only reason for denying the sewer connections was that fifty-five of the 324 units to be constructed within the sewer district would have septic systems. Thus, the water pollution control authority implied that it would approve an application for sewer connections for 269 units, even though existing regulations allowed only 240 units. Moreover, the proposed zoning regulation merely provided for a *maximum* gross density of two units per acre; it did not call for the density of approximately one unit per acre entailed by the subdivision plan. It is reasonably probable, therefore, that a reconfigured subdivision plan could exceed the density allowed under existing regulations, meet the requirements of the water pollution control

were valid reasons for denying the amendments. We conclude that the trial court properly determined that neither reason justified the denial of the amendments.

## A

As a preliminary matter, we address the standard of judicial review in affordable housing appeals. We last considered this question in *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, 256 Conn. 674, 726, 780 A.2d 1 (2001). In that case, we considered the effect of P.A. 00-206, § 1 (g),[12] on the appeal provisions of § 8-30g. We determined that the legislature had enacted P.A. 00-206, § 1 (g), in reaction to our decision in *Christian Activities Council, Congregational* v. *Town Council*, 249 Conn. 566, 589, 735 A.2d 231 (1999) (*Christian Activities Council*), in which we had concluded that the sufficient evidence test applied to all four prongs

authority and meet the housing opportunity development zone criteria. Accordingly, the denial of the subdivision application on the basis of the denial of the sewer connections would not have required denial of the zoning amendments.

[12] Public Act 00-206, § 1 (g) amended General Statutes (Rev. to 1999) § 8-30g (c) as follows: "[(c)] *(g)* Upon an appeal taken under subsection [(b)] *(f)* of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that [(1) (A)] the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record. [; (B)] *The commission shall also have the burden to prove, based upon the evidence in the record compiled before such commission, that (1) (A)* the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; [(C)] *(B)* such public interests clearly outweigh the need for affordable housing; and [(D)] *(C)* such public interests cannot be protected by reasonable changes to the affordable housing development, or (2) (A) the application which was the subject of the decision from which such appeal was taken would locate affordable housing in an area which is zoned for industrial use and which does not permit residential uses, and (B) the development is not assisted housing, as defined in subsection (a) of this section. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it." The bracketed portions were deleted by P.A. 00-206, § 1 (g) and the italicized portions were added.

of General Statutes (Rev. to 1999) § 8-30g (c) (1), which is now codified as amended at § 8-30g (g). *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, supra, 727–28. We concluded in *Quarry Knoll II Corp.* that, by enacting P.A. 00-206, § 1 (g), the legislature had intended to clarify that there are two standards of judicial review in affordable housing appeals. See id., 726. "Under [the first sentence of § 8-30g (g)], the court must determine, as we had prior to the enactment of P.A. 00-206, § 1 (g), whether the commission has shown that its decision is supported by sufficient evidence in the record. Under subparagraphs [(1) (A), (B) and (C)] of the statute, however, the court must review the commission's decision independently, based upon its own scrupulous examination of the record. Therefore, the proper scope of review regarding whether the commission has sustained its burden of proof, namely that: its decision is based upon the protection of some substantial public interest; the public interest clearly outweighs the need for affordable housing; and there are no modifications that reasonably can be made to the application that would permit the application to be granted—requires the court, not to ascertain whether the commission's decision is supported by sufficient evidence, but to conduct a plenary review of the record in order to make an independent determination on this issue." (Internal quotation marks omitted.) Id., 727. We also concluded in *Quarry Knoll II Corp.* that P.A. 00-206, § 1 (g) applies retroactively because it was intended to be clarifying legislation. Id., 728.

The zoning commission argues that, in performing its plenary review under *Quarry Knoll II Corp.*, the trial court in the present case was required to review the entire administrative record to determine whether there was sufficient evidence supporting the zoning commission's decision, but was not allowed independently to weigh the evidence. In support of that argu-

ment, the zoning commission relies on our statement in *Quarry Knoll II Corp.* that P.A. 00-206, § 1 (g), "address[ed] the *scope of review,* not the burden of persuasion." (Emphasis in original.) Id., 721. Thus, the zoning commission argues, P.A. 00-206, § 1 (g), did not affect this court's holding in *Christian Activities Council, Congregational* v. *Town Council,* supra, 249 Conn. 566, that the "sufficient evidence" test applies to the zoning commission's determinations pursuant to § 8-30g (g) (1) (A), (B) and (C). Rather, it argues, that amendment merely required the trial court to determine independently whether there was sufficient evidence in the record to support the zoning commission's decision. We disagree.

In order to address the zoning commission's argument, it is necessary to examine the distinction that we made in *Christian Activities Council* and in *Quarry Knoll II Corp.* between the concepts of burden of persuasion and standard of judicial review. In *Christian Activities Council,* we recognized that the "sufficient evidence" standard is not a burden of persuasion, which ordinarily requires the finder of fact to have a specific level of certainty, but, instead, is a standard of judicial review, the function of which is to allocate decision-making authority between the decision maker and the reviewing court. *Christian Activities Council, Congregational* v. *Town Council,* supra, 249 Conn. 580–81. We stated in that case that "[a]lthough [General Statutes (Rev. to 1999)] § 8-30g (c) [now (g)] uses language slightly suggestive of fact-finding [by the trial court],[13] albeit inaccurately, *the zoning commission remains the fact finder,* as in a traditional zoning case, and there is nothing but a minimal linguistic inaccuracy to

---

[13] "For example, in an appeal from the denial of an affordable housing land use application, [General Statutes (Rev. to 1999)] § 8-30g (c) (1) [now (g)] places a 'burden' on the zoning commission to 'prove' the criteria set forth in subparagraphs (A), (B), (C) and (D)." *Christian Activities Council, Congregational* v. *Town Council,* supra, 249 Conn. 581 n.17.

indicate otherwise." (Emphasis added.) Id., 581. Thus, we recognized that, as a general matter, the burden of proving facts is not imposed on a finder of fact. We also concluded that the "sufficient evidence" standard of judicial review applied to all four prongs of General Statutes (Rev. to 1999) § 8-30g (c) (1), now (g). Id., 589–90.

As the zoning commission points out, we again concluded in *Quarry Knoll II Corp.* that P.A. 00-206, § 1 (g), addressed the scope of judicial review, not the burden of persuasion. *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, supra, 256 Conn. 721. Thus, we implicitly recognized that the planning and zoning commission continued to be the finder of fact. We also determined, however, that the amendment clarified that the trial court must conduct a plenary review of the record; id., 727; and make an independent determination that denial of the affordable housing application "(A) . . . is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (B) such public interests clearly outweigh the need for affordable housing; and (C) such public interests cannot be protected by reasonable changes to the affordable housing development . . . ." General Statutes § 8-30g (g) (1). Thus, we recognized that these are not factual determinations, but mixed factual and legal determinations, the legal components of which are subject to plenary review. *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, supra, 727. In other words, we concluded in *Quarry Knoll II Corp.* that, under P.A. 00-206, § 1 (g), the planning and zoning commission remains the finder of fact and any facts found are subject to the "sufficient evidence" standard of judicial review. Id. The amendment was intended to clarify, however, that application of the legal standards set forth in § 8-30g (g) (1) (A), (B) and (C) to those facts is a mixed question of law

and fact subject to plenary review.[14] Accordingly, we reject the zoning commission's claim that the trial court is limited under all four prongs of the statute to determining whether the zoning commission's determinations are supported by sufficient evidence.

In addition, we conclude that, in determining whether the record contains sufficient evidence to support the zoning commission's decision under the first prong of § 8-30g (g), the trial court should continue to apply the standard adopted by this court in *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 653 A.2d 798 (1995). In that case, the defendant argued that "the trial court improperly required evidence that the zone change would result in a 'definite or reasonably likely harm' to the watershed, when the [zoning] commission merely needed to show record evidence that the harm was a 'possibility.' " Id., 154–55. We agreed with the defendant that "a zoning authority, acting in its legislative capacity,

[14] We recognize that P.A. 00-206, § 1 (g), specifically provided that the "commission shall . . . have the *burden to prove*" the matters set forth in subparagraph (1) of that statute. (Emphasis added.) We continue to believe, however, that the statute does not impose on the commission a burden of proving facts as that concept is traditionally understood in the fact-finding context. See *Christian Activities Council, Congregational* v. *Town Council,* supra, 249 Conn. 579 ("concept of a burden of persuasion ordinarily applies to questions of fact"). Rather, the burden imposed by § 8-30g (g) (1) is akin to the burden imposed on a party who seeks to have a statute declared unconstitutional, which is a legal determination. See *State* v. *Higgins,* 265 Conn. 35, 62, 826 A.2d 1126 (2003) ("party attacking a validly enacted statute . . . bears the heavy burden of proving its unconstitutionality beyond a reasonable doubt"). This burden is met not by proving facts to a given level of certainty, but by presenting persuasive legal and policy arguments.

We also recognize that the legislature struck the term "matter of law" from the original version of the bill ultimately enacted as P.A. 00-206, § 1 (g), because certain legislators were concerned that, if the phrase were included, the amendment could be construed as a substantive, rather than a clarifying, change in the law. See *Quarry Knoll II Corp.* v. *Planning & Zoning Commission,* supra, 256 Conn. 724–25. Nevertheless, it was implicit in the amendment that the legislature believed that determinations under § 8-30g (g) (1) have a legal component that is subject to the plenary review of the court.

is not limited to considering only the effects of its actions that are definite or more likely than not." Id., 156. We disagreed, however, that the "mere possibility" of harm was a sufficient reason to deny a zone change. Id. We concluded that the "sufficient evidence" standard of § 8-30g (c) required the zoning commission to "show a reasonable basis in the record for concluding that its decision was necessary to protect substantial public interests. The record, therefore, must contain evidence concerning the potential harm that would result if the zone [change were granted] and concerning the probability that such harm in fact would occur." Id. We conclude that this standard is still valid as it applies to determinations under the first prong of § 8-30g (g). Nothing in P.A. 00-206, § 1 (g), or in our decision in *Quarry Knoll II Corp.* suggests otherwise.

In summary, we conclude that in conducting its review in an affordable housing appeal, the trial court must first determine whether "the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record." General Statutes § 8-30g (g). Specifically, the court must determine whether the record establishes that there is more than a mere theoretical possibility, but not necessarily a likelihood, of a specific harm to the public interest if the application is granted. If the court finds that such sufficient evidence exists, then it must conduct a plenary review of the record and determine independently whether the commission's decision was necessary to protect substantial interests in health, safety or other matters that the commission legally may consider, whether the risk of such harm to such public interests clearly outweighs the need for affordable housing, and whether the public interest can be protected by reasonable changes to the affordable housing development.[15]

---

[15] "Because the plaintiff[s'] appeal to the trial court is based solely on the record, the scope of the trial court's review of the [commission's] decision

## B

With these principles in mind, we turn to the zoning commission's claim that the trial court improperly determined that the soil contamination was not a valid reason for denying the zoning amendments. We disagree.

## 1

Before addressing the merits of this claim, we must address the zoning commission's claim that the trial court improperly determined that the soil contamination issue was not relevant to the request for an amendment of the zoning map. The plaintiffs counter that the issue was relevant only to the request for site plan approval. We conclude that the issue was relevant to all three requests: text amendment, map amendment and site plan approval.

The zoning commission points out that, in its motion for denial of the plaintiffs' application, it incorporated all of its reasons for denying the text amendment—including the soil contamination issue—into its reasons for denying the map amendment. It further points out that the trial court stated in its memorandum of decision that "the zoning commission cited its concerns over the inadequacy of [the plaintiffs'] plan to remedy the problem of residual pesticides in the soil as a reason for denying both the creation of the requested [housing opportunity development] zone and the proposed site plan." The zoning commission argues that, by referring only to the "housing opportunity development zone and proposed site plan," the court implicitly, and improperly, failed to consider whether the soil contamination issue justified the denial of the proposed map amendment. It is not entirely clear to us that the trial court

and the scope of our review of that decision are the same." (Internal quotation marks omitted.) *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, supra, 256 Conn. 726 n.29.

intended to exclude the map amendment from the phrase "the creation of the requested [housing opportunity development] zone," but we assume for purposes of considering this claim that it did.

The plaintiffs counter that the soil contamination issue was relevant only to the site plan application.[16] They argue that, under General Statutes § 8-2,[17] the zoning regulation amendment and zoning map amendment "implicate [only] the suitability and capacity of the land

---

[16] The plaintiffs argue that the trial court properly concluded that the soil contamination issue was relevant only to the site plan and should not be considered in connection with the text amendment and the map amendment. As the zoning commission points out, however, the trial court did not consider the soil issue solely in connection with the site plan. Rather, the court considered whether the issue was a valid "reason for denying *both* the creation of the requested [housing opportunity development] zone and the proposed site plan." (Emphasis added.) Accordingly, we treat the plaintiffs' claim as an alternate ground for affirmance with respect to the zoning amendments.

[17] General Statutes § 8-2 (a) provides in relevant part: "The zoning commission of each . . . town . . . is authorized to regulate, within the limits of such municipality, the . . . use of buildings, structures and land for trade, industry, residence or other purposes . . . . Such zoning commission may divide the municipality into districts . . . and . . . may regulate the . . . use of buildings or structures and the use of land. All such regulations . . . may provide that certain . . . uses of land are permitted only after obtaining a special permit or special exception from a zoning commission, planning commission . . . [or] combined planning and zoning commission . . . subject to standards set forth in the regulations and to conditions necessary to protect the public health, safety, convenience and property values. . . . Such regulations shall be designed to lessen congestion in the streets; to secure safety from fire, panic, flood and other dangers; to promote health and the general welfare; to provide adequate light and air; to prevent the overcrowding of land; to avoid undue concentration of population and to facilitate the adequate provision for transportation, water, sewerage, schools, parks and other public requirements. Such regulations shall be made with reasonable consideration as to the character of the district and its peculiar suitability for particular uses and with a view to conserving the value of buildings and encouraging the most appropriate use of land throughout such municipality. Such regulations may, to the extent consistent with soil types, terrain, infrastructure capacity and the plan of conservation and development for the community, provide for cluster development, as defined in section 8-18, in residential zones. . . ."

to handle the density that could be achieved under [the proposed amendments], i.e., the availability of sewage disposal, water supply, and road networks to support a single-family cluster development at an overall density of one home per acre." They further argue that the zoning amendments "sought only to convert a property zoned as-of-right for 240 homes on large lots to 371 homes clustered in order to maximize open space. This change per se could not conceivably implicate a substantial public interest in health or safety."[18] We disagree.

Section 8-2 (a) provides that zoning regulations and the configuration of zoning districts should "promote health and the general welfare," a requirement that clearly authorizes the zoning commission to consider whether allowing a proposed zoning district could result in health risks to the public.[19] In this case, the parties agree that the proposed zoning district applied

---

[18] Thus, the plaintiffs appear to argue that, if they had submitted a site plan in conformance with existing regulations, the zoning commission would not have been authorized to consider whether the contaminated soils created a health risk to future residents. We note, however, that § 22a-19 (b) provides: "In any administrative, licensing or other proceeding, the agency shall consider the alleged unreasonable pollution, impairment or destruction of the public trust in the air, water or other natural resources of the state and no conduct shall be authorized or approved which does, or is reasonably likely to, have such effect so long as, considering all relevant surrounding circumstances and factors, there is a feasible and prudent alternative consistent with the reasonable requirements of the public health, safety and welfare." Thus, it is at least arguable that the zoning commission would be required to consider the effect of the soil contamination on the public health in reviewing a site plan submitted under existing regulations. We need not reach that question in this case, however. Even assuming that the zoning commission would not have been required to consider the soil contamination issue if the plaintiffs had proceeded under existing regulations, we conclude that the zoning commission was entitled to consider whether the more intense use of the land proposed by the plaintiffs created a risk to the public health that otherwise would not have existed.

[19] It is also arguable that the zoning commission was obligated to consider the soil contamination issue in connection with zoning amendments pursuant to § 22a-19. See footnote 18 of this opinion.

solely to the plaintiffs' property.[20] Accordingly, we conclude that it was reasonable for the zoning commission to consider the site specific characteristics of that property in ruling on the proposed text amendment, including any environmental contamination of the property that could pose a health risk to the public were the property to be developed. Although it might have been unlikely, we do not agree with the plaintiffs that it was entirely *inconceivable* that the increase in allowable density entailed by the zone change could, in and of itself, create a risk to the public health from the soil contamination. Certainly, the zoning commission was not precluded from considering that question. Accordingly, we reject the plaintiffs' claim that the soil contamination issue was relevant only to the site plan.

We also conclude that, because the text amendment related solely to the plaintiffs' property, the text amendment and the map amendment were inextricably intertwined. In other words, matters affecting the viability of one amendment necessarily would affect the viability of the other. Thus, we agree with the zoning commission that site specific concerns, such as the soil contamination, were relevant to both zoning amendment requests.

---

[20] In light of the parties agreement that the proposed zoning district applied solely to the plaintiffs' property, it is apparent that the text amendment did not create a "floating zone." "A floating zone is a special detailed use district of undetermined location in which the proposed kind, size and form of structures must be preapproved. It is legislatively predeemed compatible with the area in which it eventually locates if specified standards are met and the particular application is not unreasonable. . . . It differs from the traditional Euclidean zone in that it has no defined boundaries and is said to float over the entire area where it may eventually be established." (Citations omitted; internal quotation marks omitted.) *Schwartz* v. *Town Plan & Zoning Commission*, 168 Conn. 20, 22, 357 A.2d 495 (1975). We emphasize that our determination in the present case that the zoning commission was entitled to consider the site specific characteristics of the property in reviewing the proposed text amendment would not apply if the text amendment had created a floating zone, which, by definition, does not apply to any specific property.

We further conclude, however, that because the amendment requests were inextricably intertwined and the approval of the text amendment necessarily would imply the approval of the map amendment, the trial court's consideration of the soil issue in connection with the text amendment rendered harmless any failure of the court expressly to consider the issue in connection with the map amendment.

2

We now turn to the merits of the trial court's determination that the soil contamination issue was not a valid reason for denying the text amendment. The trial court stated that it had "reviewed all of the testimony and reports of the environmental consultants retained by the town . . . and the [coalition]. They speak in terms of their 'concerns' about the continuing presence of contaminants in the soil where [the plaintiffs] proposed to build and the 'possibilities' of harm that might arise from its failures to measure the contaminants in the ways recommended by the consultants and to conform its remediation plan to their recommendations. They raise the specter of children's illnesses and damage to wildlife, but none of these consultants was willing or able to say what particular harm would result from the identified chemicals in the soil here or from the methods of remediation proposed by [the plaintiffs], let alone the probability that such harm in fact would occur." The court concluded that "[t]here is nothing in the record that supports anything but a mere possibility that the requested subdivision approval would harm the environment."

We agree with the trial court that the record did not establish more than a mere possibility of harm. The record indicated only that residents of the development were likely to have some level of exposure to the residual pesticides. It did not establish either the extent of

that exposure or the likelihood or the extent of the harm that would be caused by the exposure. Moreover, although the zoning commission's expert criticized the plaintiffs' remediation plan as inadequate, inconclusive and unclear, he did not explain why the risk to the public health would be unacceptable if the plaintiffs were able to meet the remediation standard regulations.[21]

As we have discussed, evidence of a mere possibility of harm does not constitute sufficient evidence that a substantial public interest is threatened for purposes of § 8-30g (g). Rather, the record "must contain evidence concerning the potential harm that would result if the [zone change were granted] and concerning the probability that such harm in fact would occur." *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 156. Accordingly, we conclude that the zoning commission did not meet its burden under the first prong of § 8-30g (g).

The zoning commission claims, however, that exposure to residual pesticides cannot be distinguished from harm caused by residual pesticides. It argues that the very purpose of the remediation standard regulations is to prevent exposure to substances that are harmful per se. We are not persuaded. The purpose of the remediation standard regulations is to prevent exposure to certain harmful substances at concentrations *higher* than the concentrations set forth in the regulations. As we have noted, the purpose of the plaintiffs' remediation plan was to achieve compliance with those regulations, and the trial court imposed compliance as a condition for commencing construction.

As we have indicated, the zoning commission's experts indicated that, at most, there is a mere possibil-

---

[21] As we have noted, the trial court ordered the plaintiffs to comply with the regulations as a condition for starting construction of the development. We conclude in part V of this opinion that that condition was reasonable.

ity that, after implementation of the plan, soil conditions will not satisfy the remediation standard regulations. They did not indicate the probability that that will be the case. Nor did they state that reasonable changes in the plan could not be made in order to achieve compliance. In contrast, the plaintiffs' expert testified unequivocally before the zoning commission that, in his professional opinion, the property could be brought into compliance with the regulations.[22] Thus, the record does not contain sufficient evidence for the proposition that the plaintiffs could not achieve compliance or that compliance would be inadequate to protect the public health.

C

The zoning commission next claims that the trial court improperly found that deficiencies in the affordable housing plan did not justify denying the text amendment. We disagree.

The following additional facts are relevant to our resolution of this claim. As we have noted, the plaintiffs submitted an affordability plan as part of its original application to the zoning commission.[23] The zoning commission hired John J. Leary, an appraiser with Leary Counseling and Valuation, Inc., and Peter A. Buchsbaum, an attorney and chairman of the land use depart-

---

[22] The zoning commission argues repeatedly that it had the sole authority to assess the credibility of the witnesses and that the trial court improperly usurped that role. We need not address that argument, however, because the relative credibility of the witnesses is not at issue in this case. The trial court did not reject the findings of the zoning commission's expert witness. Rather, it concluded as a matter of law that those findings on their face did not meet the *Kaufman* requirement that the record establish more than a mere possibility of harm to a substantial public interest.

[23] The submission of an affordability plan was not statutorily required when the plaintiffs submitted the zoning amendment applications. In 2000, the legislature amended § 8-30g (b) to require the submission of an affordability plan. See P.A. 00-206, § 1 (b) (1), now codified at § 8-30g (b) (1). The zoning commission makes no claim that the amended statute applies retroactively to the plaintiffs' application.

ment at the law firm of Greenbaum, Rowe, Smith, Ravin, Davis and Himmel in Woodbridge, New Jersey, to evaluate the plaintiffs' initial affordability plan. Leary prepared a report in which he raised the following concerns: (1) the plan's mortgage calculations were incorrect and underestimated the monthly payments that would be required to support the stated mortgage amounts; (2) the plan assumed a 20 percent downpayment, which might be difficult for a qualified buyer to obtain; (3) the plan did not state the relationship between development cost and affordable price range; (4) the plan subjected qualified buyers to the risk of loss from increases in mortgage interest rates; (5) the plan subjected buyers to the developer's right of first refusal during the life of the plan, using the same mathematical pricing formula as the original plan, thereby reducing the relative marketability of the units. In a separate letter to the zoning commission, Leary made recommendations for amending the plan to address these concerns.[24] Leary also raised these concerns in testimony before the zoning commission at a hearing on the original affordable housing plan. Buchsbaum testified at the same hearing and raised similar concerns. After the hearing, Buchsbaum submitted a letter to the zoning commission making ten recommendations for amending the plan to address his concerns.[25]

---

[24] Specifically, Leary recommended that the plaintiffs: (1) recalculate the affordable housing price range using correct mortgage calculations; (2) clarify the rationale for the monthly association fees; (3) provide and fund an affordable housing buyer protection plan to protect against loss caused by interest rate increases; and (4) eliminate the developer's right of first refusal except for units participating in the buyer protection plan.

[25] Specifically, Buchsbaum recommended: (1) requiring that downpayments not exceed 5 percent; (2) protecting purchasers from losses caused by interest rate increases; (3) providing some rental housing; (4) deleting or amending the right of first refusal provision; (5) providing long-term guarantees of proper administration; (6) including detached affordable housing units and integrating the units more fully into the development; (7) providing a process for reviewing and approving improvements to units; (8) providing a broader range of prices; (9) providing some one bedroom units;

The plaintiffs submitted a revised affordability plan with their revised zoning applications. The revised plan contained some, but not all, of the changes recommended by Leary and Buchsbaum.[26] At the June 29, 2000 hearing on the revised zoning applications, an unidentified member of the zoning commission stated that the zoning commission felt that the revised affordability plan still did not adequately protect potential buyers from "onerous" downpayments or from the effects of interest rate swings. Counsel for the plaintiffs responded that the 20 percent downpayment was a maximum and that many potential buyers might prefer to make a large downpayment.[27] With respect to the interest rate concern, counsel for the plaintiffs stated that the blue ribbon commission on affordable housing had considered amending the affordable housing statute to include a provision protecting buyers from interest rate increases but had decided not to do so because interest rate swings are "just the reality" of owning property.

In its reasons for denying the text amendment, the zoning commission stated that "[t]he affordability plan, while improved, still contains some of the deficiencies pointed out by [Leary] and [Buchsbaum]. The failure to adopt the specific suggestions that . . . Leary and Buchsbaum provided is the reason for its rejection. All of the suggestions of . . . Buchsbaum and . . . Leary should be accepted in toto and the required downpay-

and (10) ensuring that an appropriate number of affordable units are built and occupied as market units are built and occupied.

[26] Inter alia, the revised plan: (1) provided that the town could withhold certificates of occupancy for market-rate units until a sufficient number of certificates of occupancy for housing opportunity units had been issued to maintain the required ratio between the types of units; (2) deleted the incorrect mortgage calculations; (3) provided that the downpayment for a housing opportunity unit would not exceed 20 percent; and (4) provided an explanation for the common interest ownership association fees.

[27] As the trial court noted, state regulations provide for a maximum downpayment of 20 percent in calculating the maximum sale or resale price of an affordable housing unit. See Regs., Conn. State Agencies § 8-30g-8 (c).

ment for affordable units should not exceed 10 [percent] (which will still allow purchasers to pay more down or buy for cash if they wish)."

The trial court found that "the [zoning] commission's concern with the downpayment, as well as its other stipulations, were mere expressions of its opinions about the affordability plan" and, as such, did not constitute sufficient evidence for purposes of the first prong of § 8-30g (g). It also found that "[t]he [zoning] commission has failed to identify a particular public interest or state how that public interest is jeopardized by the affordability plan as revised. There is no evidence that the maximum downpayment set by [the plaintiffs] or the other provisions of its affordability plan critiqued by the [zoning] commission and its consultants implicate a substantial public interest in health, safety or other legitimate concerns. At best the [zoning] commission's concerns with the affordability plan can be characterized as a policy disagreement, not a public health or safety issue that warrants a denial of the application." In addition, the court found that the zoning commission had failed to weigh the deficiencies in the affordability plan against the town's need for affordable housing and had failed to establish that reasonable changes in the affordability plan could not be made to protect the public interests involved.

We agree with the trial court that the deficiencies in the affordability plan did not constitute sufficient evidence of harm to an identified public interest justifying denial of the amendments. First, as we have noted, there was no statutory requirement that the plaintiffs submit *any* affordability plan to the zoning commission. See footnote 23 of this opinion. In the absence of any such requirement, it is difficult to see why the submission of an *imperfect* affordability plan should constitute a reason for denying the zoning amendments. Second, as the trial court noted, the zoning commission did not expressly identify any specific public interest the

protection of which required denial of the text amendment.[28] Our review of the record leads us to believe that the zoning commission's primary objective was to protect potential buyers of the affordable units from undue financial burdens and risks. Typically, such concerns are a matter for negotiation between the buyer and the mortgage lender. The zoning commission has not explained why this negotiation process would be inadequate to protect potential buyers of affordable units and other residents of the development or why its concern over financial risk to potential buyers constituted a "[matter] which the commission may legally consider"; General Statutes § 8-30g (g) (1) (A); as a reason for denying the zoning amendments. Moreover, as the trial court also noted, the zoning commission did not explain why reasonable changes to the plan could not be made to protect any such interest. Accordingly, we reject this claim.

### III

We next address the zoning commission's claim that the trial court improperly determined that the zoning commission had failed expressly to acknowledge the town's need for affordable housing and to balance that need against the need to protect a substantial public interest. The trial court stated in its memorandum of decision that it had searched the record "in vain for any evidence that the zoning commission received any information, other than that provided by [the plaintiffs] or conducted any discussions concerning the need for affordable housing and how that need stacked up against the problems it saw in [the plaintiffs'] propos-

---

[28] The zoning commission states in its brief to this court that the affordability plan was not "accurate" or "achievable" and that it was under no obligation "to approve an unworkable affordable housing development." It has not explained, however, how the plan was unworkable or why the alleged flaws in the plan mandated denial of the zoning amendments rather than approval of the amendments conditioned on changes to the affordability plan that would render it workable.

als." The zoning commission contends that it implicitly acknowledged the town's need for affordable housing in conducting its review of the plaintiffs' submissions. It also points to a zoning commission member's statement, made during the July 17, 2000 zoning commission meeting to consider the plaintiffs' application, that the "town . . . is looking . . . and would embrace affordable housing if the components were appropriate and the health, safety and welfare of the people of this town were going to be considered." The zoning commission further contends that the trial court's decision "rest[ed] solely upon its untenable finding that the [zoning] [c]ommission did not acknowledge [the town's] need for affordable housing."

In *Quarry Knoll II Corp.*, this court stated that the planning and zoning commission "was not required to *state expressly* in its decision that its reasons for rejecting the applications clearly outweighed the need for affordable housing . . . ." (Emphasis in original.) *Quarry Knoll II Corp.* v. *Planning & Zoning Commission*, supra, 256 Conn. 729–30. "[S]uch a requirement would exalt form over substance and result in an 'unwarranted disregard' of any legitimate reasons that the [planning and zoning] commission may have had for denying the application . . . ." Id., 730.

We agree with the zoning commission that it was not required to acknowledge expressly on the record the town's need for affordable housing or that its reasons for denying the applications clearly outweighed that need. We disagree, however, that the trial court's decision was based solely on a finding that the zoning commission had failed to do so. Rather, as we have indicated, the trial court carefully examined the record, considered each reason presented by the zoning commission and independently weighed each reason against the town's need for affordable housing. Accordingly, we conclude that, to the extent that the trial court's memorandum of decision suggested that the zoning

commission was required expressly to acknowledge the town's need for affordable housing, any such suggestion was improper but harmless.

## IV

We next consider the zoning commission's claim that the trial court improperly failed to consider the cumulative weight of the zoning commission's reasons for denying the zoning amendments. We disagree. As we have noted, the only reasons for denial before us in this appeal are the soil contamination issue and the deficiencies in the affordability plan. We have concluded that the zoning commission established only a mere possibility of harm to the public health from the residual pesticides and that it did not identify the substantial public interest implicated by flaws in the affordability plan or establish that denial of the plan was necessary to protect that interest. We conclude that, even considered cumulatively, these reasons did not constitute a threat to a substantial public interest. Although there may be cases in which the cumulative weight of the reasons for denial implicates a substantial public interest even though each individual reason does not, this is not such a case.

## V

Finally, we address the zoning commission's claim that the trial court improperly imposed unreasonable conditions on the approval of the zoning amendments instead of affirming its denial of the applications and dismissing the plaintiffs' appeal. We disagree.

The first and second conditions imposed on the approval related only to the site plan. We already have concluded that the plaintiffs' claim that the zoning commission improperly denied the site plan application is moot. Accordingly, we need consider only the third and fourth conditions imposed by the trial court, namely, that "[a]nalysis of postremediation soil sampling and groundwater monitoring must demonstrate that all

applicable Connecticut remediation standard regulations . . . have been met" and that "[a]ll soil remediation activities and postremediation monitoring must be completed, and the property must be in compliance with the applicable [regulations] before any construction begins."

The zoning commission points out that, under § 8-30g (g) (1) (C), it can deny an affordable housing application if substantial public interests outweigh the town's need for affordable housing and "such public interests cannot be protected by *reasonable* changes to the affordable housing development"; (emphasis added); and argues that the conditions imposed by the court were not reasonable. It does not explain, however, why reasonable changes would not protect the public interest in this case or why the court's changes are not reasonable. It has pointed to no evidence in the record establishing that there is no reasonable probability that the plaintiffs will be able to comply with the remediation standard regulations, and we have already concluded that the record does not establish that, if the plaintiffs can comply with the regulations, there is more than a mere possibility of harm to the public health. Accordingly, we conclude that the trial court was authorized to impose the conditions on the approval of the zoning amendments.

The judgment of the trial court is reversed only to the extent that it sustained the plaintiffs' appeal from the zoning commission's denial of the site plan application and the case is remanded to the trial court with direction to dismiss that portion of the plaintiffs' appeal. The judgment is affirmed in all other respects.

In this opinion the other justices concurred.