## EUREKA V, LLC *v.* PLANNING AND ZONING COMMISSION OF THE TOWN OF RIDGEFIELD ET AL.
### (AC 33125)

DiPentima, C. J., and Gruendel and Robinson, Js.

Argued February 16—officially released November 27, 2012

*Matthew Ranelli*, with whom, on the brief, was *Joseph P. Williams*, for the appellant (plaintiff).

*Thomas W. Beecher*, for the appellee (named defendant).

*Jessica Morowitz* and *Roger Reynolds* filed a brief for the Connecticut Fund for the Environment, Inc., and Rivers Alliance of Connecticut, Inc., as amicus curiae.

*Elizabeth P. Gilson* filed a brief for the Connecticut Water Works Association, Inc., as amicus curiae.

*Opinion*

ROBINSON, J. The plaintiff, Eureka V, LLC, appeals from the judgment of the Superior Court sustaining, in part, the plaintiff's appeal from the decisions of the defendant planning and zoning commission of the town of Ridgefield[1] on the plaintiff's affordable housing applications, which sought amendments to the town's zoning regulations and zoning map. On appeal, the plaintiff

---

[1] We refer to the planning and zoning commission of the town of Ridgefield as the defendant throughout this opinion. Ridgefield Open Space Association, Inc., and Connecticut Fund for the Environment, Inc., intervened in the administrative proceedings before the defendant pursuant to General Statutes § 22a-19, and the plaintiff initially named both of those entities as additional defendants in its administrative appeal to the Superior Court. The plaintiff, however, later withdrew the appeal as to both. After the appeal was filed with the Superior Court, the town of Ridgefield filed a motion to intervene as a party defendant pursuant to § 22a-19. Although the court granted the motion to intervene, it does not appear from the record before us that the town participated further in the proceedings before the Superior Court. The town of Ridgefield is not listed as a party on the trial court's docket sheet, and it is not a party to the present appeal.

We granted Connecticut Fund for the Environment, Inc., and Rivers Alliance of Connecticut, Inc., permission to file a joint amicus brief in support of the defendant's decision. Connecticut Water Works Association, Inc., also was permitted to file an amicus brief supporting the position of the defendant.

claims that the court improperly upheld that portion of the defendant's decision that imposed conditions effectively banning development of affordable housing on a portion of the plaintiff's property located within a public water supply watershed area, including prohibiting the extension of municipal sewer lines into or through the watershed area. Because we conclude that the defendant failed to meet its statutory burden of establishing that the restrictions it imposed were necessary to protect a substantial public health or safety interest; see General Statutes § 8-30g (g) (1) (A);[2] we reverse the judgment of the Superior Court and remand the matter for further proceedings.

The record reveals the following relevant facts and procedural history. The plaintiff is the owner of a 153 acre parcel of property located at 616 Bennett's Farm Road in Ridgefield (subject property). Sixty-seven acres of the subject property are located within the watershed for the Saugatuck Reservoir, a source of public drinking water. In April, 2007, the plaintiff filed applications with the defendant pursuant to § 8-30g that sought the

[2] General Statutes § 8-30g (g) provides: "Upon an appeal taken under subsection (f) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record. The commission shall also have the burden to prove, based upon the evidence in the record compiled before such commission, that (1) (A) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (B) such public interests clearly outweigh the need for affordable housing; and (C) such public interests cannot be protected by reasonable changes to the affordable housing development, or (2) (A) the application which was the subject of the decision from which such appeal was taken would locate affordable housing in an area which is zoned for industrial use and which does not permit residential uses, and (B) the development is not assisted housing, as defined in subsection (a) of this section. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it."

approval of amendments to the town's zoning map and zoning regulations.[3] At the time the plaintiff filed the applications, the subject property was zoned as a corporate development district, which permitted various types of commercial use but not residential development. The plaintiff proposed to amend the town's zoning regulations to create a new housing opportunity development zone and to amend the town's zoning map to reflect a rezoning of the subject property from a corporate development district to the newly created housing opportunity development zone. Along with its applications, the plaintiff submitted a conceptual site plan that illustrated the potential future development of the subject property as a site for residential housing. The conceptual site plan, as originally submitted, envisioned 509 residential units, divided roughly in half between three bedroom town homes and one and two bedroom apartments, approximately 30 percent of which would be affordable housing. The plaintiff was not seeking formal site plan approval of the conceptual site plan.

On November 13, 2007, after several days of public hearings, the defendant rendered its decision on the plaintiff's applications. The defendant adopted much of the plaintiff's proposed zoning regulation amendments with some significant modifications. For example, rather than amending the zoning regulations to create a new housing opportunity development zone as proposed by the plaintiff, the defendant instead modified the town's existing housing opportunity development provisions so that they could be applied as an overlay zone to designated properties, including the subject property. In light of the overlay provisions, the defendant denied the plaintiff's application to amend the

---

[3] The plaintiff also filed an application seeking changes to the town's plan of conservation and development. The defendant's resolution of that application is not at issue in the present appeal.

zoning map to indicate a rezoning of the subject property.[4]

Although the new zoning provisions adopted by the defendant permitted the development of affordable housing on the subject property, the regulations limited development to a lot density of 1.9 dwelling units per gross acre of land, which was substantially less than the fourteen units per acre density initially sought by the plaintiff. The newly adopted provisions also provided that all housing opportunity development dwelling units must be served by the municipal water and sewer system, and that no sewer line could be extended into or cross through the Saugatuck Reservoir public water supply watershed area, effectively prohibiting development of any residential units on the sixty-seven acres located in the watershed area. The defendant also made modifications to the regulations submitted by the plaintiff as to the required percentage of age restricted units, the number of allowable bedrooms per unit and the size of lot setbacks.

The defendant stated in its decision that the modifications it had made to the plaintiff's applications were necessary to protect the public's interest in maintaining a safe and healthy public water supply, and that such public interests "clearly outweigh the need for affordable housing at the density and in the locations proposed by the [plaintiff] while still permitting a development under § 8-30g which is the largest affordable housing development ever considered in the [t]own of Ridgefield . . . ." The defendant further stated that its decision was supported by the strong opinions opposing the proposed development as expressed in letters from the state's department of public health and from the

_____

[4] The defendant later agreed to amend the zoning map to reflect the two parcels, including the subject property, that were designated as eligible for application of the overlay provisions.

Aquarion Water Company (Aquarion), which owned and operated the Saugatuck Reservoir.

Rather than immediately appeal from the defendant's November 13, 2007 decision, the plaintiff submitted a modified application in accordance with § 8-30g (h).[5] One proposed revision was to allow residential units to be connected either to the municipal sewer system or to private septic systems. Another proposed revision was to limit development on the watershed portion of the subject property to a lot density of one unit per acre, thus resulting in a proposed 2.6 units per acre density for the overall site. Along with the modified application, the plaintiff submitted a new conceptual site plan that reflected a reduction in the total number of proposed units on the subject property in accordance with its proposed revisions from 509 to 389 total units, which included a marked reduction in the number of units proposed for the watershed area.

After a public hearing on the plaintiff's modified application, the defendant issued a February 12, 2008 decision that accepted in part and rejected in part the plaintiff's proposed modifications. The defendant

[5] General Statutes § 8-30g (h) provides in relevant part: "Following a decision by a commission to reject an affordable housing application or to approve an application with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units, the applicant may, within the period for filing an appeal of such decision, submit to the commission a proposed modification of its proposal responding to some or all of the objections or restrictions articulated by the commission, which shall be treated as an amendment to the original proposal. The day of receipt of such a modification shall be determined in the same manner as the day of receipt is determined for an original application. The filing of such a proposed modification shall stay the period for filing an appeal from the decision of the commission on the original application. . . . Within the time period for filing an appeal on the proposed modification as set forth in section 8-8, 8-9, 8-28, 8-30 or 8-30a, as applicable, the applicant may appeal the commission's decision on the original application and the proposed modification in the manner set forth in this section. . . ."

refused to adopt the proposal to permit the use of private septic systems, maintaining its ban on any development on the sixty-seven acres located within the watershed area. The defendant also denied the proposal to increase the maximum lot density on the subject property from 1.9 to 2.6 units per acre, although it agreed to a more modest increase in lot density to two units per acre in order to accommodate the construction of some additional residential units on the nonwatershed portion of the subject property.

On April 17, 2008, the plaintiff filed an appeal with the Superior Court challenging portions of the defendant's November 13, 2007 and February 12, 2008 decisions. Specifically, the plaintiff challenged the two unit per acre lot density, the complete restriction of development on the sixty-seven watershed acres, the requirement that residential units connect to the town's sewer system as well as the provisions establishing the percentage of age restricted units, the number of allowable bedrooms per unit and the size of side and rear yard setbacks.

On October 20, 2010, the court issued a decision that, in large part, sustained the plaintiff's appeal. The court concluded that the defendant's decision to limit lot density to two units per acre on the nonwatershed portion of the subject property was arbitrary and that the defendant had failed to meet its burden to show that such a restriction was necessary to protect a public health and safety interest. The court similarly concluded that it could not uphold the defendant's decision regarding the sewering requirements for the nonwatershed portion of the subject property because the defendant had failed to cite any substantial public interest that would be harmed by allowing sewering in the nonwatershed area either from a neighboring city or by private septic systems. The court also determined that the defendant had failed to meet its burden of establishing that the adopted

restrictions in the regulations regarding age of occu-
pants, allowable number of bedrooms per unit and set-
back size were necessary to address a public health
and safety concern or other substantial public interest.

With regard to the watershed portion of the subject
property, the court concluded that the "weight of the
evidence" supported the defendant's decision not to
permit the development of affordable housing because
such a ban was necessary to protect the public's sub-
stantial interest in maintaining a safe public drinking
water supply. The court also upheld the defendant's
decision not to allow sewer lines to enter the watershed
area or to permit private septic systems on watershed
lands, again concluding that the possible degradation
of the public water supply provided a sound basis for
such a decision.

The court remanded the matter to the defendant with
direction to approve the plaintiff's modified application
under reasonably justified terms and conditions with
regard to the nonwatershed portion of the subject prop-
erty. The plaintiff filed this appeal challenging that por-
tion of the court's decision concluding that the
defendant had "sufficiently demonstrated that preclud-
ing development of housing or sewer within the Sauga-
tuck watershed land is necessary to protect a
substantial public interest."[6]

We first address the legal framework that governs
our consideration of the plaintiff's appeal. Section 8-
30g sets forth the procedures and guidelines applicable

_____

[6] Although the court remanded the matter to the defendant, we conclude
that the present appeal nevertheless was taken from an appealable final
judgment pursuant to *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 131,
653 A.2d 798 (1995) (holding remand order that directed zoning commission
to approve application and that gave opportunity for commission to impose
reasonable conditions was appealable final judgment because order did not
require commission to hear additional evidence and proceedings on remand
could not deprive plaintiff of changes trial court ordered).

to an affordable housing appeal. Section 8-30g (f) provides in relevant part: "Any person whose affordable housing application is denied *or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units in a set-aside development,* may appeal such decision pursuant to the procedures of this section. . . ." (Emphasis added.) As previously noted, § 8-30g (g) provides in relevant part: "Upon an appeal taken under subsection (f) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission that the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record. The commission shall also have the burden to prove, based upon the evidence in the record compiled before such commission, that (1) (A) the decision is necessary to protect substantial public interests in health, safety, or other matters which the commission may legally consider; (B) such public interests clearly outweigh the need for affordable housing; and (C) such public interests cannot be protected by reasonable changes to the affordable housing development . . . . If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it."[7]

In considering whether a decision that is the subject of a § 8-30g appeal is supported by sufficient evidence

[7] Our Supreme Court has explained that "the key purpose of § 8-30g is to encourage and facilitate the much needed development of affordable housing throughout the state. . . . Requiring the town to state its reasons on the record when it denies an affordable housing land use application will further that purpose because it will help guard against possibly pretextual denials of such applications." (Citation omitted; internal quotation marks omitted.) *Christian Activities Council, Congregational* v. *Town Council,* 249 Conn. 566, 577, 735 A.2d 231 (1999).

in the record to satisfy the requirement set forth in the first sentence of § 8-30g (g), our Supreme Court has instructed that "the court must determine whether the record establishes that there is more than a mere theoretical possibility, but not necessarily a likelihood, of a specific harm to the public interest if the application is granted. If the court finds that such sufficient evidence exists, then it must conduct a plenary review of the record and determine independently whether the commission's decision was necessary to protect substantial interests in health, safety or other matters that the commission legally may consider, whether the risk of such harm to such public interests clearly outweighs the need for affordable housing, and whether the public interest can be protected by reasonable changes to the affordable housing development." *River Bend Associates, Inc.* v. *Zoning Commission*, 271 Conn. 1, 26, 856 A.2d 973 (2004). The foregoing determinations present "mixed factual and legal determinations, the legal components of which are subject to plenary review. . . . [T]he planning and zoning commission remains the finder of fact and any facts found are subject to the 'sufficient evidence' standard of judicial review." (Citations omitted.) Id., 24. "Because the plaintiff['s] appeal to the trial court is based solely on the record, the scope of the trial court's review of the [commission's] decision and the scope of [an appellate court's] review of that decision are the same." (Internal quotation marks omitted.) Id., 26 n.15.

I

Before turning to the merits of the appeal, we first briefly discuss the issue of aggrievement. Aggrievement is a threshold matter that implicates subject matter jurisdiction, and, therefore, whether raised by the parties or by the court sua sponte, it must be resolved before addressing claims raised on appeal. See *PHH Mortgage Corp.* v. *Cameron*, 130 Conn. App. 238, 241,

22 A.3d 1282 (2011), and cases cited therein. It is axiomatic that "[t]here is no absolute right of appeal to the courts from a decision of a [planning and zoning commission]. . . . Appeals to the court from [commissions] exist only under statutory authority . . . . Appellate jurisdiction is derived from the . . . statutory provisions by which it is created, and can be acquired and exercised only in the manner prescribed." (Internal quotation marks omitted.) *Warner* v. *Planning & Zoning Commission*, 120 Conn. App. 50, 61, 990 A.2d 1243, cert. denied, 297 Conn. 901, 994 A.2d 1289 (2010). Section 8-30g (f) provides that an affordable housing appeal may be brought by any person whose affordable housing application either "is denied *or is approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units in a set-aside development* . . . ." (Emphasis added.) In the present case, the plaintiff's affordable housing applications as modified were not denied outright; rather, they were approved with restrictions. Accordingly, to satisfy the statutory provisions in § 8-30g (f) that confer standing to bring an affordable housing appeal, it was incumbent on the plaintiff to establish before the Superior Court that the defendant's decisions created a substantial adverse impact either on the viability of the planned affordable housing development or on the degree of affordability of the planned affordable dwelling units. See *Christian Activities Council, Congregational* v. *Town Council*, 249 Conn. 566, 575–76, 735 A.2d 231 (1999) (where town grants application without imposing restrictions having substantial adverse impact on viability or affordability of affordable housing development no appeal lies pursuant to what is now § 8-30g (f), although traditional zoning appeal not precluded).

In its decisions on the plaintiff's affordable housing applications, the defendant repeatedly stated that

"[t]here has been no evidence submitted by the [plaintiff] to establish that the [defendant's decision] has had a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units." The plaintiff nevertheless alleged in its appeal to the Superior Court that "[the defendant]'s resolution approving the [housing opportunity development] amendment with substantial modifications . . . substantially reduces or destroys the viability and affordability of the proposed plan." In its decision on the merits, the Superior Court disposed of the threshold issue of aggrievement by stating that the plaintiff was aggrieved on the basis of its ownership of the subject property, although that fact alone would not be sufficient to establish statutory aggrievement under the previously stated provision of § 8-30g (f). Given the defendant's finding that the plaintiff had not presented evidence necessary to establish aggrievement under § 8-30g, and because the plaintiff initially did not provide this court with transcripts of the proceedings before the Superior Court, our review of the record left us with some concern as to whether the court properly had exercised jurisdiction over the present appeal.

We asked the parties to file supplemental briefs addressing the issue of statutory aggrievement pursuant to § 8-30g and whether, if absent, the Superior Court nevertheless had the authority to consider the plaintiff's appeal pursuant to its authority to adjudicate zoning appeals pursuant to General Statutes § 8-8 (b).[8] As part of its response to our supplemental briefing order, the

[8] General Statutes § 8-8 (b) provides in relevant part: "Except as provided in subsections (c), (d) and (r) of this section and sections 7-147 and 7-147i, any person aggrieved by any decision of a board, including a decision to approve or deny a site plan pursuant to subsection (g) of section 8-3 or a special permit or special exception pursuant to section 8-3c, may take an appeal to the superior court for the judicial district in which the municipality is located, notwithstanding any right to appeal to a municipal zoning board of appeals under section 8-6. . . ."

plaintiff filed that portion of the transcript before the Superior Court in which the plaintiff had endeavored to present its aggrievement evidence to the court. Having now reviewed that transcript, in which counsel for the defendant did not object to the assertion of the plaintiff's fact witness that the restrictions imposed by the defendant would, in fact, substantially and adversely affect the viability of the plaintiff's project,[9] we conclude that the plaintiff met its burden, albeit minimally, of presenting evidence sufficient to establish aggrievement to bring the present affordable housing appeal.[10] We turn, therefore, to the merits of the appeal.

[9] The relevant colloquy from the July 16, 2010 direct examination of the plaintiff's witness, John Sanders, is as follows:

"[The Plaintiff's Counsel]: Will the, will the restrictions imposed by the [defendant] substantially and adversely affect the viability of the project for [the plaintiff]?

"[The Witness]: Yes, they will.

"[The Plaintiff's Counsel]: And—

"[The Defendant's Counsel]: Your Honor, if I may.

"The Court: Yes.

"[The Defendant's Counsel]: Just for the record, the [defendant] is not taking any position on it or objecting to the finding of an aggrievement here.

"The Court: All right.

"[The Plaintiff's Counsel]: Okay. Well, in that case—

"The Court: Well, I think you—you're right that you, even though you're not taking a position, you have to put this on the record. And if he were not able to say it will affect, then obviously there would be a problem. But, here you've got deeds, you've got the fact that he says it affects, I don't think we really have to belabor the point.

"[The Plaintiff's Counsel]: Just being cautious, Your Honor.

"The Court: Okay.

"[The Plaintiff's Counsel]: That's fine. Thank you, Mr. Sanders.

"The Court: Did you have any questions, sir?

"[The Defendant's Counsel]: I do not, Your Honor. I do not.

"The Court: Okay.

"[The Defendant's Counsel]: And that's why—

"The Court: All right.

"[The Defendant's Counsel]: —I interjected—

"The Court: Sure.

"[The Defendant's Counsel]: —that we weren't taking a position.

"The Court: I think we're all set on aggrievement."

[10] The defendant, in addition to addressing the aggrievement issue as framed in our supplemental briefing order, also raised as an additional

II

As indicated, the decisions under review are not an outright denial of the plaintiff's applications. Rather, the defendant accepted with modifications the zoning changes sought by the plaintiff, thereby setting the stage for the future development of the subject property as a site for affordable housing while, at the same time, attempting to protect a source of public drinking water by concentrating any development to the nonwatershed portion of the property. The defendant reasoned that allowing development on the watershed portion of the property, at least at the density proposed by the plaintiff, could present more than a theoretical possibility of harm to the Saugatuck Reservoir public water supply watershed area.

The plaintiff cannot, and does not, dispute that the protection of public drinking water supplies is a legitimate public health and safety concern that the defendant properly considered in evaluating the plaintiff's

argument that the plaintiff was not aggrieved by the defendant's action on its application for changes to the zoning regulation because the plaintiff could always submit an affordable housing site plan application that did not comply with all aspects of the regulations as adopted by the defendant. The defendant relies on a Superior Court's analysis of our decision in *Wisniowski* v. *Planning Commission*, 37 Conn. App. 303, 311–18, 655 A.2d 1146, cert. denied, 233 Conn. 909, 658 A.2d 981 (1995), in which we held that the defendant planning commission could not justify the denial of an affordable housing development application on the ground that the proposed development would not be in compliance with existing zoning regulations. Although we agree with the defendant that the plaintiff could submit an application for site plan approval that fails to comply with the newly adopted regulations, we are not persuaded that that opportunity in any way negates statutory aggrievement as established in the present case. To hold otherwise would effectively eliminate the right of a party to appeal from a ruling on any application for a zone change or change to zoning regulations in connection with an affordable housing development that did not simultaneously seek site plan approval. Such a holding would run afoul of prior Supreme Court holdings and legislative intent, and, thus, we will not consider it further. See General Statutes § 8-30g (a) (2); *Kaufman* v. *Zoning Commission*, 232 Conn. 122, 140, 653 A.2d 798 (1995) (§ 8-30g is remedial statute that must be liberally construed in favor of those whom legislature intended to benefit);

applications. Any substantial risk to the public's legitimate interest in maintaining safe and healthy drinking water certainly could outweigh the need for affordable housing. In this regard, the state legislature has provided that local zoning commissions, in enacting zoning regulations and local conservation and development plans, should give reasonable consideration toward "the protection of existing and potential public surface and ground drinking water supplies." General Statutes §§ 8-2 (a) and 8-23 (d). It is among the water resources policies of this state "(1) [t]o preserve and protect water supply watershed lands and prevent degradation of surface water and groundwaters; (2) to protect groundwater recharge areas critical to existing and potential drinking water supplies; (3) to make water resources conservation a priority in all decisions . . . (5) to prevent contamination of water supply sources or reduction in the availability of future water supplies . . . ." General Statutes § 22a-380.

Our review of the record reveals that the defendant was presented with conflicting evidence regarding the potential impact that development of the subject property would have on the safety of the public drinking water supply. John Block and Peter Galant addressed the defendant on behalf of the plaintiff. Galant is the vice president of Tighe and Bond, Inc., the engineering and environmental consulting company hired by the plaintiff to analyze the means of providing water and sewer service to the subject property, and Block is a registered professional engineer employed by Tighe and Bond, Inc. Block spoke regarding sewer options and on-site storm water management, and Galant spoke about the watershed and watershed protection. Block opined that "there [would be] no increase in public

*West Hartford Interfaith Coalition, Inc.* v. *Town Council,* 228 Conn. 498, 508–509, 636 A.2d 1342 (1994) (§ 8-30g applies without qualification to any type of application filed in connection with affordable housing proposal).

health and safety issues associated with sewage, as well as with storm water management elements related to the zoning change." He indicated that the plaintiff intended to construct an on-site wastewater treatment facility outside of the watershed area to handle stormwater runoff and that the plaintiff was committed to employing good engineering principles, best management practices and state-of-the-art technology in preparing its water and sewage management plans. Block acknowledged that more detailed plans would be revealed during the formal site plan approval process.

Galant noted that the subject property currently was zoned for commercial use, which, in his opinion, had the potential of exposing the subject property to uses that could present a far higher risk of harm to the public water supply than the residential use proposed in the plaintiff's applications. He also explained and illustrated by use of a map that the subject property was located in the "far reaches" of the Saugatuck Reservoir watershed, and comprised only .2 percent of the entire watershed area, so that there would be ample opportunity for renovation and dilution of any potentially contaminated water from the proposed site.

In setting forth the reasons why it chose not to adopt the applications as submitted, however, the defendant chose not to credit the opinions offered by Galant and Block. Instead, the defendant based its decision on the opinions expressed in letters from the state's department of public health and Aquarion, both of which opposed the plaintiff's applications as submitted. See *Kaufman v. Zoning Commission*, 232 Conn. 122, 156–57, 653 A.2d 798 (1995) (within province of commission to decide whether to give credence to expert opinions).

The June 15, 2007 Aquarion letter was signed by Brian T. Roach, a senior environmental analyst for Aquarion.

Roach stated that any high density residential development on the watershed, such as that proposed by the plaintiff, had been shown "to create significantly more adverse effects to water quality than those associated with less intensive, large-lot residential development." Roach also attempted to counter the argument that effects on the water supply would be minimized by the remote location of the subject property with respect to the reservoir and the small size of the watershed area at issue when compared to the entire watershed. He explained that the defendant must also consider the potential cumulative impacts on water quality, noting: "A specific development may not in itself have a deleterious impact on a water supply reservoir. However, the cumulative impact of a number of discrete projects may result in negative impact on water quality."

In support of his position, Roach cited favorably to the state's department of environmental protection publication, "Protecting Connecticut's Water-Supply Watersheds: A Guide for Local Officials," a copy of which was part of the record before the defendant. He noted that the report contains an indication that "a maximum density of [one] dwelling per [two] acres will provide adequate protection of water quality" provided that reasonable pollution control measures are followed. Roach also indicated that the proposal to permit the running of sewer lines through the watershed portion of the subject property was "the most alarming aspect" of the plaintiff's plan given that sewer system failures are commonplace and well documented. Aquarion made clear its belief that permitting the pumping of sewage through the watershed "would create an unacceptable risk of pollution to the [Saugatuck] Reservoir," although it provided no quantitative assessments of the potential level of harm to the watershed or of the probability that the harm actually would occur if the plaintiff's applications were granted.

The letter from the department of public health was signed by Lori Mathieu, supervisor of the department's source water protection unit. According to Mathieu, the zoning changes as proposed in the plaintiff's initial applications were inconsistent with the state's conservation and development plan, which recommended that intensive development be guided away from water supply watersheds. In reference to the applications being considered by the defendant, Mathieu stated that the proposed zoning changes had "the potential to increase the risk to public health due to the high density residential land use." Mathieu also stated that "direct harm to the public will be realized by allowing for intensive land use that is inconsistent with long standing" state water source protection policies and that developments of the size and density proposed "have not been allowed within the state's public water supply watershed areas due to [those policies]." The letter concluded: "Finally, consistent with the [state's conservation and development policies], when public drinking water supply watershed and groundwater recharge area land is developed, low density residential development is the least impacting and most preferable land use from a public health perspective. Use of minimum sustainable lot sizes of two or more acres should adequately protect public drinking water supplies while allowing community growth."

On the basis of our plenary review of the record and the reasons cited by the defendant for its decisions, we conclude that there was sufficient evidence before the defendant to support its initial determination that the granting of the plaintiff's applications as submitted would present more than a mere theoretical possibility of a specific harm to the public's substantial interest in maintaining a safe and healthy drinking water supply. Accordingly, the defendant was justified in making modifications to the applications. Nevertheless, the

defendant failed to meet the additional burden imposed by § 8-30g to prove that the modifications that it chose to adopt were necessary to protect that public interest.

Neither of the letters discussed previously in this opinion, both of which the defendant cited as the reason for its modifications to the plaintiff's applications, recommended a complete ban on residential development on the watershed portion of the subject property. The Aquarion letter advised only that "high density" residential development should be avoided. The letter cited agreement with the state's guidelines that "adequate protection of water quality" could be achieved by allowing density of one dwelling unit per two acres. The department of public health letter similarly concluded that two acre lots "should adequately protect public drinking water supplies while allowing community growth." Thus, the evidence before the defendant was that development of the size and density proposed by the plaintiff should not be permitted on the watershed portion of the subject property because such development would pose a substantial risk to the public drinking water supply. The evidence supported limiting development on the watershed portion of the subject property to a density of not more than one dwelling unit per two acres; it did not support an outright ban. Although the defendant's ultimate choice, clearly made out of an abundance of caution, to ban all development on the watershed area and to increase development on the nonwatershed portion of the subject property as an offset may have been a reasonable solution, the test we must apply under § 8-30g is not whether the defendant's decision was reasonable, but whether the decision was necessary. Because the evidence in the record shows that allowing development at a lower density than that sought by the plaintiff could have adequately protected the public's interest in safe drinking water, the outright ban was not a necessary precaution.

Finally, the plaintiff claims that the defendant's decision to prohibit extension of public sewers through the watershed portion of the subject property for the purpose of serving affordable housing is not supported by the record, is based on generalized fears and "guidance documents" and is inconsistent with the defendant's treatment of all other watershed property in Ridgefield. We agree that, as with the outright ban on development in the watershed area, the defendant has failed its evidentiary burden of showing that a ban on sewering within the watershed area is necessary to protect the public's interest in safe drinking water.

In *Kaufman* v. *Zoning Commission*, supra, 232 Conn. 154–56, our Supreme Court rejected a defendant commission's citing of potential harm to the Lake Kenosia watershed as the basis for denying an application for a zone change necessary to accommodate the development of affordable housing on the plaintiff's property. In discussing the commission's burden of showing a reasonable basis in the record for concluding that its decision was necessary to protect substantial public interests, the court explained that the record needed to "contain evidence concerning the potential harm that would result if the zone were changed . . . and concerning *the probability that such harm in fact would occur.*" (Emphasis added.) Id., 156. The Supreme Court determined that the record before the commission contained no evidence that either quantified the potential level of harm to the watershed or estimated the probability that such harm would actually occur if the commission granted the requested zone change. Id., 162. Here, as in *Kaufman*, the defendant made its decision to ban all sewering in the watershed portion of the subject property solely on the basis of generalized evidence of the potential for harm to watersheds from sewer line breaks and other potential avenues for contamination, without any evidence of the likelihood that

such harm actually might occur on the subject property or establishing the level of harm that might result. Without such evidence, the defendant could not determine that its decision was necessary to protect the public's interest vis-à-vis the watershed or that the harm clearly outweighed the town's need for affordable housing.

The judgment is reversed and the case is remanded with direction to sustain the plaintiff's appeal as to the density and sewering restrictions imposed by the defendant with regard to the watershed portion of the subject property and to remand the matter to the defendant with direction to approve the plaintiff's applications under reasonably justified terms and conditions with regard to the watershed portion of the subject property in accordance with this opinion.

In this opinion the other judges concurred.