******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

JAG CAPITAL DRIVE, LLC *v.* EAST
LYME ZONING COMMISSION
(AC 37924)

Sheldon, Mullins and Harper, Js.

*Argued May 19—officially released October 4, 2016*

(Appeal from Superior Court, judicial district of
Hartford, Land Use Litigation Docket, Cohn, J.)

*Edward B. O'Connell*, with whom, on the brief, was

*Mark S. Zamarka*, for the appellant (defendant).

*Timothy S. Hollister*, with whom was *Andrea L. Gomes*, for the appellee (plaintiff).

*Opinion*

SHELDON, J. The defendant, the East Lyme Zoning Commission (commission), appeals from the judgment of the Superior Court sustaining the administrative appeal of the plaintiff, JAG Capital Drive, LLC, from the commission's denial of the plaintiff's application for approval of a proposed affordable housing development. The commission claims that the trial court erred in concluding that it failed to meet its burden of proof in denying the plaintiff's application on the ground of the industrial zone exemption—that the proposed affordable housing development would be located in an area which is zoned for industrial use and does not permit residential uses—pursuant to General Statutes § 8-30g (g) (2) (A). More specifically, the commission claims that the trial court erred in determining that the area in which the proposed affordable housing project would be located permits residential uses.[1] We disagree with the commission, and thus affirm the judgment of the trial court sustaining the plaintiff's appeal from the commission's denial of its affordable housing application.

In its December 23, 2014 memorandum of decision, sustaining the plaintiff's administrative appeal, the trial court set forth the following relevant factual and procedural history. "The plaintiff's land is located in East Lyme. It consists of 24 acres, zoned LI, Light Industrial, adjacent on the north side to a small commercial/light industrial area served by a street called Capital Drive, ending in a cul-de-sac north of [the plaintiff's] 24 acres. West of the plaintiff's property are wetlands, a stream, and the East Lyme/Old Lyme border. To the east are a single-family residential neighborhood and Camp Niantic, a seasonal campground. To the south is State Route 156, which in that location is called West Main Street. The plaintiff's property has frontage on Route 156/West Main. . . .

"The plaintiff filed its initial application for site plan approval with the commission on August 7, 2012, consisting of 69 units, a proportion of which were to be affordable housing units under § 8-30g. . . . The units were to form a residential development to be known as 'Rocky Neck Village,' proposed as rental units with possible future conversion to common interest ownership. They were to be two bedroom townhome style units. . . . The town's wetlands commission had given its approval to the development in March 2011. . . .

"The commission held a public hearing on this application on February 7, 2013. The plaintiff's attorney and his designees explained the proposed site plan demonstrating that it would not cause any health or safety concerns, submitted a traffic report that had no safety concerns, entered favorable reports on stormwater and other environmental topics, and explained the inappli-

cability of coastal management zoning. The attorney also explained the difficulties that the plaintiff faced in marketing the property for light industrial use. . . .

"The commission staff gave a presentation and the public spoke out, some favoring and others objecting to the site plan. There was also testimony from three business owners located in the LI zone of the application. Norman Birk, president of Birk Manufacturing, informed the commission that his company uses corrosive acids, liquid stainless steel and metal finishing techniques in the manufacture of circuit boards. . . . It has an approval from the Department of Energy and Environmental Protection to treat wastewater on site. . . . In 2011, Birk Manufacturing experienced an industrial accident when bari-chloride and muriatic acid were mixed, creating dangerous chlorine gas. Federal, state and local agencies, including a hazardous materials team were called to the scene, a large portion of the industrial park was evacuated and two Birk employees were hospitalized. . . .

"Two other company executives also spoke at the public hearing. The first was Susan Spellman, owner of Salon Associates, also located on Capital Drive. Her company receives, stores and ships chemicals used in the salon industry, including bleach, aerosols and acetones. In 2011 she was visited by an FBI agent to explain that the type of chemicals at her site might make her business a terrorist target, and to suggest means of safe storage. . . . Richard Beck, owner of Embalmer's Supply Company on Capital Drive, informed the commission that he stores embalming fluid and formaldehyde, a carcinogen on site. Evidence was taken of industrial sized truck traffic in the industrial park at all hours. . . .

"The plaintiff's attorney in reply stated to the commission that the project would be built in stages starting from Route 156. The only contact with Capital Drive would be the opening of an access road for water and other utilities. He also pointed out that the Birk Manufacturing incident had occurred inside the building, the longstanding proximity of the three businesses to the single-family residential neighborhood to the southeast, and during five to six months of each year, to Camp Niantic, a residential campground to the east and south of the plaintiff's parcel. He also noted the fact that the commission had approved the 38 Hope Street residential development in the LI zone in 2006, with an adjacent lumber yard with truck traffic and an active rail line. . . .

"On February 21, 2013, the commission met after the close of the public hearing. It concluded that the application should be denied on the ground that it was proposed in a Light Industrial District, under § 11 of its zoning regulations.[2] It was to be located in an area zoned for industrial use and in which residential uses were not permitted. The commission's resolution stated

that it acted under the provisions of the affordable housing statutes that had an exemption for an 'industrial zone.' [General Statutes} § 8-30g (g) (2) (A). . . .

"Notice of the denial of the plaintiff's application was published on March 14, 2013. . . . On March 28, 2013, the plaintiff filed a resubmission pursuant to § 8-30g (h). . . . The revised site plan (1) eliminated nine units closest to the existing uses in the LI zone as well as one building, (2) increased landscaped buffer between the industrial uses and the proposed homes to meet the East Lyme multifamily/affordable housing regulations, (3) reduced site coverage, (4) improved traffic access, (5) increased open space, and (6) decreased stormwater runoff. . . .

"At a public hearing on May 16, 2013, a professional engineer, retained by the commission, suggested minor plan revisions that were accepted by the plaintiff. . . . The plaintiff provided documentation that the LI zone allowed for types of residential uses. . . . These documents included the commission's 1990 resolution approving Bride Brook [Nursing and Rehabilitation Center (Bride Brook)] as a place where people would 'reside' within the LI zone, along with its approvals of Sea Spray [Condominiums, an affordable housing development] and 38 Hope Street as multifamily residential uses on parcels zoned LI.

"The plaintiff noted that Salon Enterprises, an operation discussed at the original public hearing, was a wholesale business, not a manufacturing facility; it conducts on-site classes for beauty parlor employees. As to Birk Manufacturing, the plaintiff showed that in the revised plan, Birk's building at its closest point is 360 feet from the corner of the nearest residential unit. The attorney for the plaintiff concluded that Birk did not expect future accidents. This was also confirmed by Mr. Birk. . . . Birk and Spellman from Salon did express concern that the approval of the plaintiff's application could cause them to have to consider moving out of East Lyme to another location. . . .

"The commission voted at its June 6, 2013 meeting to deny the plaintiff's amended application. The commission adopted a resolution that states in part as follows: 'Whereas, for the purposes of this Resolution, the Commission will address the Amended Application in two separate parts: (1) As an affordable housing application that would locate affordable housing in an area which is zoned for industrial use . . . and (2) As an application for approval of an affordable housing development pursuant to General Statutes § 8-30g (g) (1).'

"With regard to the 'industrial use' exception, the commission found that the proposed development 'would be located entirely in an area that is presently zoned Light Industrial (LI) according to the East Lyme Zoning Map.' It further found that the LI zone provided

for industrial and commercial uses and did not permit residential uses in the zone. The commission had heard testimony from business owners in the zone on the industrial uses in the area, 'including, but not limited to, manufacturing processes, heavy truck travel and chemical manufacturing, storage and transportation.'

"It was resolved that the commission denied the amended application 'to be located on Capital Drive at or near its intersection with Route 156 in East Lyme, for the reason that the development is located entirely in an area which is zoned for industrial use and which does not permit residential uses, and that the Application does not seek approval for assisted housing as defined in § 8-30g (a) of the General Statutes.' . . .

"With regard to the general approval of an affordable housing development, [the commission found that] there was both sufficient evidence and evidence of the need to protect the public health and safety to support the commission's denial. The development was inconsistent with the town's plan of conservation and development. It was to be located in an LI zone with industrial uses, as stated above. There was an industrial accident of concern in the last year requiring evacuation of the area, drawing responses from hazardous materials teams, the Department of Energy and Environmental Protection and the federal [Environmental Protection Agency]. There was a 'quantifiable probability' of specific harm raising interests in public health and safety. 'There is a necessity to protect the public that cannot be remedied by changes to the application and the risk of such harm to the public interest outweighs the need for affordable housing.' . . .

"This appeal [from the commission's denial of the plaintiff's application] was subsequently filed. On July 15, 2014, the attorneys for the parties and the court conducted a view of the site. The group met at the cul-de-sac end of Capital Drive. Birk Manufacturing was to the left, as well as a parking lot and a small garden. Outside of Birk were two burning pots of some type. Salon Enterprises was to the right. There were a few other buildings in the cul-de-sac. There was no heavy truck traffic at the time of the viewing in midday. The court and the parties walked down a path into a wooded area. To the left along this path is Camp Niantic and to the right is an open space conservation area with the Four Mile River. The entryway to the proposed project is about 400 feet from the cul-de-sac in the midst of the woods. At this point, the plaintiff proposes to place a gate and additional plantings. The court viewed the general area where the development is to be built. There were people making use of the trail into the woods for recreational activities. This trail is to serve as an emergency entrance and exit to the development. The parties returned to the cul-de-sac and drove out of Capital Drive to Route 156. The court observed the

premises along Route 156, commercial in nature, the main entrance to the proposed development, and also [Bride Brook]. Sea Spray was also viewable nearby.

"Along with the view that the court conducted, the court ordered that the commission hold a further factual hearing on the 'day-to-day operation' of Bride Brook. This order was based on exhibit M, which dated from 1989/1990, where a Bride Brook officer indicated that the center was functioning partly as a 'rest home.' The commission conducted a further hearing on September 18, 2014, at which an affidavit of Dianne Caristo-Gaynor, the administrator of Bride Brook, was introduced.

"The affidavit, dated August 9, 2014, declared in paragraph 9 that the 'second and third floors are home to 87 Long Term Care Residents.' These residents are 'expected to live at Bride Brook for the remainder of their lives. Some have lived here more than 15 years.' In paragraph 10, the administrator stated the following indicia of the residents' residing in their 'home.' They have no other home; they are to live at Bride Brook indefinitely; they are registered to vote at Bride Brook; they receive mail at this address; they are considered in a residential community; they participate in the planning of their medical treatment; they are allowed to manage their personal financial affairs; they participate in social, religious, and community activities of choice; they have visits from family, friends and acquaintances; and they are treated with dignity and individuality, including privacy.

"During the hearing, the zoning officer obtained testimony from the administrator of Bride Brook that the residents were closely supervised by nursing staff and a doctor on call. . . . There were no kitchens in the individual units. . . . The residents may leave the premises at will, but usually leave with relatives or in a Bride Brook van. . . . The residents must be admitted to Bride Brook on medical orders, not just on their own application." (Citations omitted; footnotes altered.)

With that as background, the court undertook a plenary review of the record to consider whether the commission had satisfied its burden under the industrial zone exception[3] pursuant to § 8-30g (g) (2) (A)—of proving that the proposed affordable housing development would be located in an area which is zoned for industrial use and does not permit residential uses.[4] The court explained: "The issue in this case is only whether the zoned area permits usages consistent with a residential use. That is why the court was particularly interested in the hearing conducted on remand concerning the Bride Brook facility. Bride Brook was approved in 1990 in the LI zone under a special permit for convalescent homes, as allowed by [§ 11.2.7 of the East Lyme Zoning Regulations]."

The court found: "Here . . . there is a factual record showing that there are 87 people who live, have individual and community activities and vote at Bride Brook. They consider it to be their legal residence. These are permanent residents in the zone in question, living a short distance from the proposed 60 unit residential development plan of the plaintiff." The court analogized the circumstances presented in this case to those in *Glastonbury Affordable Housing Development, Inc.* v. *Town Council*, Superior Court, judicial district of Hartford-New Britain, Docket No. CV 94-0543581 (September 4, 1996), in which the court directed the defendant to approve an affordable housing development where the zoning regulations permitted a "range of population-intensive uses," including "a convalescent, nursing or rest home." The court in the present case found: "This is also the situation here, based on the situation of the Bride Brook residents."

The court therefore concluded that the industrial zone exception did not apply here, and thus that the commission's denial of the affordable housing application could not be sustained on that basis. The court remanded the matter to the commission with direction to approve the plaintiff's application, subject to reasonable conditions not inconsistent with approval. The commission thereafter filed a petition for certification to appeal pursuant to General Statutes § 8-8 (o). We granted the commission's petition and this appeal followed.

The parameters of our review of an affordable housing appeal are circumscribed by § 8-30g (g), which provides: "Upon an appeal taken under subsection (f) of this section, the burden shall be on the commission to prove, based upon the evidence in the record compiled before such commission, that the decision from which such appeal is taken and the reasons cited for such decision are supported by sufficient evidence in the record. The commission shall also have the burden to prove, based upon the evidence in the record compiled before such commission, that (1) (A) the decision is necessary to protect substantial public interests in health, safety or other matters which the commission may legally consider; (B) such public interests clearly outweigh the need for affordable housing; and (C) such public interests cannot be protected by reasonable changes to the affordable housing development, or (2) (A) the application which was the subject of the decision from which such appeal was taken would locate affordable housing in an area which is zoned for industrial use and which does not permit residential uses; and (B) the development is not assisted housing, as defined in subsection (a) of this section. If the commission does not satisfy its burden of proof under this subsection, the court shall wholly or partly revise, modify, remand or reverse the decision from which the

appeal was taken in a manner consistent with the evidence in the record before it."

The standard of review embodied in § 8-30g (g) is twofold in nature. "Under [the first sentence of § 8-30g (g)], the court must determine . . . whether the commission has shown that its decision is supported by sufficient evidence in the record. Under subparagraphs [(1) (A), (B) and (C)] of the statute, however, the court must review the commission's decision independently, based upon its own scrupulous examination of the record. Therefore, the proper scope of review regarding whether the commission has sustained its burden of proof, namely that: its decision is based upon the protection of some substantial public interest; the public interest clearly outweighs the need for affordable housing; and there are no modifications that reasonably can be made to the application that would permit the application to be granted—requires the court, not to ascertain whether the commission's decision is supported by sufficient evidence, but to conduct a plenary review of the record in order to make an independent determination on this issue." (Internal quotation marks omitted.) *River Bend Associates, Inc.* v. *Zoning Commission*, 271 Conn. 1, 22, 856 A.2d 973 (2004). "[Although the] commission remains the finder of fact and any facts found are subject to the 'sufficient evidence' standard of judicial review . . . th[e] application of the legal standards set forth in § 8-30g (g) (1) (A), (B) and (C) to those facts is a mixed question of law and fact subject to plenary review." (Citation omitted.) Id., 24–25. "Because the plaintiff[s'] appeal to the trial court is based solely on the record, the scope of the trial court's review of the [commission's] decision and the scope of our review of that decision are the same." (Internal quotation marks omitted.) Id., 26–27 n.15. Because we find no principled reason for distinguishing between subdivisions (1) and (2) of § 8-30g (g) with regard to the commission's obligation; see *JPI Partners, LLC* v. *Planning & Zoning Board*, 259 Conn. 675, 691, 791 A.2d 552 (2002); the issue of whether it met its statutory burden to prove that the industrial use exemption applies presents a mixed question of law and fact over which our review is plenary.

It is undisputed that the affordable housing development for which the plaintiff sought approval in this case represents a residential use. The only issue before us is whether the proposed affordable housing development would be located in an area that is zoned for industrial use and does not permit residential uses.

Resolution of this issue requires us to review the statutory language of § 8-30g (g) and the town of East Lyme's municipal zoning regulations, the interpretation of which presents a question of law over which our review is plenary. *Alvord Investment, LLC* v. *Zoning Board of Appeals*, 282 Conn. 393, 416, 920 A.2d 1000

(2007). The following principles regarding the interplay between the affordable housing statute and municipal zoning regulations are instructive. Our Supreme Court has "outlined the differences that [it] had identified previously between an affordable housing land use appeal brought pursuant to § 8-30g and a traditional zoning appeal. First, an appeal under § 8-30g [f] may be filed only by an applicant for an affordable housing development whose application was denied or [was] approved with restrictions which have a substantial adverse impact on the viability of the affordable housing development or the degree of affordability of the affordable dwelling units . . . .

"Second, the scope of judicial review under § 8-30g [g] requires the town, not the applicant, to marshal the evidence supporting its decision and to persuade the court that there is sufficient evidence in the record to support the town's decision and the reasons given for that decision. By contrast, in a traditional zoning appeal, the scope of review requires the appealing aggrieved party to marshal the evidence in the record, and to establish that the decision was not reasonably supported by the record. . . .

"Third, if a town denies an affordable housing land use application, it must state its reasons on the record, and that statement must take the form of a formal, official, collective statement of reasons for its actions. . . . By contrast, in a traditional zoning appeal, if a zoning agency has failed to give such reasons, the court is obligated to search the entire record to find a basis for the [agency's] decision. . . .

"We reach this conclusion based on the text and the purpose of the statute. The text requires that the town establish that sufficient record evidence supports the decision from which such appeal is taken and the reasons cited for such decision . . . . Thus, textually the statute contemplates reasons that are cited by the town. This strongly suggests that such reasons be cited by the zoning agency at the time it took its formal vote on the application, rather than reasons that later might be culled from the record, which would include, as in a traditional zoning appeal, the record of the entire span of hearings that preceded the vote. . . . Furthermore, the key purpose of § 8-30g is to encourage and facilitate the much needed development of affordable housing throughout the state. . . . Requiring the town to state its reasons on the record when it denies an affordable housing land use application will further that purpose because it will help guard against possibly pretextual denials of such applications. We therefore read the statute, consistent with its text and purpose, to require the town to do so." (Citations omitted; emphasis omitted; internal quotation marks omitted.) *JPI Partners, LLC* v. *Planning & Zoning Board*, supra, 259 Conn. 688–90.

"The legislative history indicates that the legislature

intended to accomplish th[e] goal [of encouraging and facilitating affordable housing throughout the state] by creating specific legislation that affects only affordable housing applications, not the overall zoning scheme. Therefore, applications that do not fit into the definition of an affordable housing application are not affected by § 8-30g. If an application does satisfy the definition of an affordable housing application, however, then the commission must satisfy the increased burden of proof in order to deny the application effectively. Under these circumstances, nonconformity of zoning is not, per se, a reason to deny the application. The legislature did not intend zoning nonconformity to block an affordable housing subdivision application. . . .

"Section 8-30g is not part of the traditional land use statutory scheme. Traditional land use policies did not solve Connecticut's affordable housing problem, and the legislature passed § 8-30g to effect a change. . . .

"Section 8-30g does not allow a commission to use its traditional zoning regulations to justify a denial of an affordable housing application, but rather forces the commission to satisfy the statutory burden of proof. The factors that the commission considers when reviewing affordable housing subdivision applications are the same as those considered when it passes subdivision regulations. Instead of simply questioning whether the application complies with those regulations, however, under § 8-30g, the commission considers the rationale behind the regulations to determine whether the regulations are necessary to protect *substantial* public interests in health, safety or other matters. . . .

"Conformity [in decisions] is provided by § 8-30g because each decision must be justified in terms of the factors enumerated in the statute." (Emphasis in original; footnote omitted.) *Wisniowski* v. *Planning Commission*, 37 Conn. App. 303, 316–18, 655 A.2d 1146, cert. denied, 233 Conn. 909, 658 A.2d 981 (1995).

In sum, "zoning compliance is not mandatory prior to approval of an affordable housing subdivision application. . . . The burden of proof in § 8-30g [g] takes away some of the discretion that local commissions have under traditional land use law and allows the reviewing trial court to effect a zone change if the local commission cannot satisfy the statutory requirements for its denial of an application. Section 8-30g [g] provides that if the commission fails to satisfy its burden of proof, the trial court, 'shall wholly or partly, revise, modify, remand or reverse the decision from which the appeal was taken in a manner consistent with the evidence in the record before it.' " (Citation omitted; emphasis omitted.) Id., 319–20. With the foregoing principles in mind, we turn to the commission's claim on appeal.

Here, neither party disputes that the proposed devel-

opment would be located in an area which is zoned for industrial use. The only issue in dispute is whether that area does not permit residential uses. The commission claims that the trial court "drew conclusions of law unsupported by the record when it determined that Bride Brook Nursing and Rehabilitation Center is a residential use and the LI zone permits residential uses," and that the "trial court's conclusion that Bride Brook is a residential use is clearly erroneous and is contrary to the sufficient evidence in the record showing otherwise." (Internal quotation marks omitted.) The commission's arguments, however, demonstrate a misunderstanding of its burden in affordable housing appeals. As noted herein, the commission bears the burden of proving that the proposed affordable housing development would be located in an area which is zoned for industrial use and does not permit residential uses. We conclude that the commission failed to satisfy that burden.

As to the industrial use exemption, the commission declared, in response to both the plaintiff's initial application and its modified application for approval of the affordable housing development, that the area did not permit residential uses. More specifically, the commission stated, on both occasions, that "residential uses are not permitted in the LI zoning district." Those declarations, particularly in the absence of any reference to any evidence in the record, appear to be based solely upon the municipal regulatory definition of the zone in which the proposed development would be located. The commission looked no further than its own zoning regulations in determining the applicability of the industrial use exemption. As noted herein, zoning designations may not be the sole basis for the denial of an affordable housing regulation.

Although the commission did not point to any evidence in the record that the area in question did not permit residential uses, the court, in making its plenary determination as to whether the industrial exemption applies in this case, focused on the existing uses in LI zones in East Lyme, particularly the use of Bride Brook, which had been granted a special permit as a convalescent home in 1990. On September 18, 2014, the commission held a public hearing pursuant to the court's remand order to develop additional information concerning the day-to-day activities of Bride Brook. Following the presentation of evidence and public commenting, the public hearing was closed and the commission transitioned to a regular meeting, during which it briefly discussed the issue presented during the earlier public hearing, and then summarily concluded that "Bride Book Nursing Home and Rehabilitation Center is not a residential use pursuant to § 8-30g (2) (A) of the General Statutes, based on evidence presented pursuant to the court's remand order dated June 26, 2014."[5] As noted herein, the court disagreed

with the commission and determined that Bride Brook is a residential use and thus that the commission improperly relied upon the industrial use exemption as a basis to deny the plaintiff's application.

The East Lyme Zoning Regulations allow, by special permit, convalescent homes. Those regulations define a convalescent home as a facility that provides for those with chronic health issues,[6] which necessarily contemplates more than a transient use.[7] Indeed, as the trial court noted, the 1990 resolution of the commission described Bride Brook as a place where people would "reside" within the LI zone. Specifically, in a document that was submitted in connection with the application for the development of Bride Brook in 1990, as part of the "Description of Daily Activities," it was noted that: "There will be an average of 118 persons residing at Bride Brook at any one time." Thus, not only has Bride Brook functioned in fact as a residential use, as its administrator testified, that use was specifically contemplated ab initio and approved by the commission. We thus reject the commission's claims that the trial court improperly determined that Bride Brook is a residential use.

Although nonconformity with zoning designations may not, in itself, be sufficient grounds for the denial of an affordable housing application, conformity with those designations undoubtedly mandates the granting of such an application. Because the East Lyme Zoning Regulations permit convalescent homes in an LI zone, and convalescent homes, by their nature and borne out by the example of Bride Brook, potentially involve at least some degree of residential use, we conclude that the East Lyme Zoning Regulations cannot be construed "not [to] permit" residential uses in an area that has been zoned LI. We thus conclude that the trial court properly determined that the commission improperly denied the plaintiff's affordable housing application without proving that the proposed development would be located in an area that is zoned for industrial uses and does not permit residential uses.[8]

The judgment is affirmed.

In this opinion the other judges concurred.

[1] The commission also claims that the trial court erred in deviating from the law of the case doctrine and in basing its rejection of the industrial use exemption on a determination that the area in which the proposed development would be located permitted uses "consistent with a residential use" rather than the precise statutory language "residential use." We reject both of those claims and conclude that neither of them deserves detailed analysis.

[2] Section 11 of the East Lyme Zoning Regulations provides in relevant part:

"LI LIGHT INDUSTRIAL DISTRICTS

"GENERAL DESCRIPTION AND PURPOSE—A district suitable for heavy commercial and light manufacturing, oriented essentially to major transportation facilities. The purpose of this district is to provide areas for industrial and commercial uses in an open setting that will not have objectionable influences on adjacent residential and commercial districts.

"11.1 PERMITTED USES—The following uses of buildings and/or land and no others are permitted subject to site plan approval in accordance

with Section 24.

"11.1.1 Light industrial or manufacturing uses which are not dangerous by reason of fire or explosion, nor injurious or detrimental to the neighborhood by reason of dust, odor, fumes, wastes, smoke, glare, noise, vibration or other noxious or objectionable feature as measured at the nearest property line.

"11.1.2 Trucking Terminal.

"11.1.3 Printing or publishing.

"11.1.4 Warehouse and wholesale storage; self-storage warehouses.

"11.1.5 Commercial nurseries, greenhouses and garden centers.

"11.1.6 Office complex.

"11.1.7 All related accessory uses customarily incidental to the above permitted uses . . .

"11.2 SPECIAL PERMIT USES—The following uses may be permitted when granted a Special Permit by the Zoning Commission subject to the Special Permit Requirements of Section 25.

"11.2.1 Deli, coffee shop or cafeteria.

"11.2.2 Private training facilities, trade and technical schools and facilities of higher learning.

"11.2.3 Research, design and development facilities.

"11.2.4 Health spas and gymnasiums, sports facilities and other commercial indoor recreations.

"11.2.5 Hotels.

"11.2.6 Contractor or trade services.

"11.2.7 Convalescent homes.

"11.2.8 Motor Vehicle and heavy equipment Repairers Station.

"11.2.9 Office and retail sales of industrial services . . .

"11.2.10 Adult Use Establishments . . . ."

[3] The court "assum[ed] that the commission satisfied the [threshold] 'sufficiency test' " set forth in § 8-30g (g) and conducted its own independent review as to whether the commission met its burden of proof under § 8-30g (g) (1). The plaintiff has not challenged the court's determination that the commission met the sufficiency of the evidence standard and we thus need not address it.

The court also found that the commission failed either to show that its decision was necessary to protect substantial public interest in health, safety or other matters pursuant to § 8-30g (g) (1), or that the subject of the decision from which this appeal is taken would locate affordable housing in an area zoned for industrial use and which does not permit residential use pursuant to § 8-30g (g) (2). Because the commission has not challenged the trial court's determination that it failed to meet its burden under subdivision (1), that determination stands, and, therefore, the commission may only prevail on appeal if it can show that the trial court erred in concluding that the commission failed to meet its burden under subdivision (2).

[4] It is undisputed that the proposed development was not assisted housing.

[5] Although the individual members posited various reasons for determining whether Bride Brook was a residential use, those opinions are not those of the commission and thus may not form the basis for the denial of an application. See *Verrillo* v. *Zoning Board of Appeals*, 155 Conn. App. 657, 673–74, 111 A.3d 473 (2015) (individual reasons given by certain members of zoning agency do not amount to formal, collective, official statement of agency, are not available to show reasons for, or grounds of, zoning agency's decision and it is not appropriate for reviewing court to attempt to glean such formal, collective statement from minutes of discussion by members prior to zoning agency's vote).

[6] Section 1.50 of the December, 2012 revision of the East Lyme Zoning Regulations defines a convalescent home, which is interchangeable with a rest home, as: "An establishment which provides full convalescent or chronic care or both for three or more individuals who are not related by blood or marriage to the operator and who, by reason of chronic illness or infirmity, are unable to care for themselves. A hospital or sanitarium shall not be construed to be included in this definition."

[7] For example, § 1.24 of the December, 2012 revision of the East Lyme Zoning Regulations defines a hotel as providing "service for the use of transient guests."

[8] This conclusion is further supported by the commission's previous approval of affordable housing applications in areas zoned for light industrial use.